# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| **MOHAN KUTTY, M.D.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:05-CV-510** |
| | ) | **PHILLIPS/SHIRLEY** |
| | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF LABOR,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## SECRETARY OF LABOR'S BRIEF IN OPPOSITION TO
## <u>RESTATED PETITION FOR REVIEW</u>

i

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE:

    A.    Statutory and Regulatory Background....................................................1

    B.    Course of Proceedings ........................................................................3

    C.    Statement of Facts..............................................................................7

    D.    Decisions Below:

        1.    Decision of the Administrative Law Judge................................13

        2.    Decision of the Administrative Review Board ...........................15

ISSUES PRESENTED................................................................................18

ARGUMENT:..............................................................................................19

    1.    Standard of review ..............................................................................19

    2.    The Secretary properly applied ACWIA's no benching provision to Dr. Kutty and the medical clinics ..........................................................20

    3.    The approval by the Department of Labor and the Immigration and Naturalization Service of allegedly "defective" LCAs and HlB petitions did not relieve Dr. Kutty and the corporate entities of their responsibilities under the Immigration Act...........................................25

    4.    The agency properly ordered that Dr. Kutty reimburse the H-1B doctors for their payment of his business expenses ................................29

    5.    Dr. Kutty and the corporate entities retaliated against the H-lB doctors in violation of the INA ......................................................................33

    6.    The corporate veil was properly pierced, and therefore Dr. Kutty is personally liable for the violations.........................................................38

    7.    The Administrative Law Judge afforded Dr. Kutty Due Process .........48

i

CONCLUSION ............................................................................................................. 53

CERTIFICATE OF SERVICE ................................................................................. 54

<u>TABLE OF AUTHORITIES</u>

Cases:                                                                                        Page

<u>Administrator, Wage & Hour Div., United States Dep't of Labor v.</u>
<u>Native Techs., Inc.,</u>
ARB No. 98-034, 1999 WL 377285 (May 28, 1999) ............................................ 38

<u>American Nuclear Res., Inc. v. United States Dep't of Labor,</u>
134 F.3d 1292 (6th Cir. 1998) ................................................................................ 37

<u>American Power & Light Co. v. Securities & Exch. Comm'n,</u>
329 U.S. 90 (1946) .................................................................................................. 25

<u>Anderson v. Abbott,</u>
321 U.S. 349 (1944) ................................................................................................ 38

<u>Auer v. Robbins,</u>
519 U.S. 452 (1977) ................................................................................................ 19

<u>Bartlik v. United States Dep't of Labor,</u>
73 F.3d 100 (6th Cir. 1996) .................................................................................... 33

<u>Bear Stearns Gov't Sec., Inc. v. Dow Corning Corp.,</u>
419 F.3d 543 (6th Cir. 2005) .................................................................................. 25

<u>Boles v. National Dev. Co.,</u>

175 S.W.3d 226 (Tenn. Ct. App. 2005) ........................................................... 39, 40

<u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,</u>
419 U.S. 281 (1974) ................................................................................................ 19

<u>Brewing Corp. of Am v. Cleveland Trust Co.,</u>
185 F.2d 482 (6th Cir. 1950) .................................................................................. 23

<u>Carter-Jones Lumber Co. v. Dixie Distrib. Co.,</u>
166 F.3d 840 (6th Cir. 1999) ............................................................................ 45, 46

ii

Carter-Jones Lumber Co. v. LTV Steel Co.,
        237 F.3d 745 (6th Cir. 2001) ................................................................38, 39

CDI Info. Servs., Inc. v. Reno,
        101 F. Supp. 2d 546 (E.D. Mich. 2000), vacated on other grounds,
        278 F.3d 616 (6th Cir. 2002) ...........................................................21, 28

Cellnet v. Federal Commc'ns Comm'n,
        149 F.3d 429 (6th Cir. 1998) ...................................................................48

Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,
        467 U.S. 837 (1984)..................................................................................16

Coalition for Gov't Procurement v. Federal Prison Indus.,
        365 F.3d. 435 (6th Cir. 2004) ...................................................................48

Connecticut Nat'l Bank v. Germain,
        503 U.S. 249 (1992)..................................................................................24

East N.Y. Sav. Bank v. Hahn,
        326 U.S. 230 (1945)..................................................................................23

Espejo v. Immigration & Naturalization Serv.,
        311 F.3d 976 (9th Cir. 2002) .............................................................19, 28

Federal Deposit Ins. Corp. v. Allen,
        584 F. Supp. 386 (E.D. Tenn. 1984).........................................39, 39, 40

Federal Housing Admin. v. Darlington, Inc.,
        358 U.S. 84 (1959)....................................................................................23

Fernandez-Vargas v. Gonzales,
        126 S. Ct. 2422 (2006)..............................................................................23

Fleming v. Rhodes,
        331 U.S. 100 (1947)..................................................................................23

Flynn v. Greg Anthony Constr. Co.
        95 F. App'x 726 (6th Cir. 2003) ...............................................................45

Gozlon-Peretz v. United States,
        498 U.S. 395 (1991)..................................................................................21

iii

Hix v. Director, Office of Workers' Comp. Programs,
    824 F.2d 526 (6th Cir. 1987) ...........................................................20, 48

Immigration & Naturalization Serv. v. Aguirre-Aguirre,
    526 U.S. 415 (1999)...............................................................16, 19, 28

Immigration & Naturalization Serv. v. Cardoza-Fonseca,
    480 U.S. 421 (1987)......................................................................45

Johnson v. Georgia Dep't of Human Res.,
    983 F. Supp. 1464 (N.D. Ga. 1996) ..................................................25

Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.,
    872 F.2d 702 (6th Cir. 1988) ...........................................................38

Landgraf v. USI Film Prods.,
    511 U.S. 244 (1994)......................................................................22

Long Island Care at Home, Ltd. v. Coke,
    __ S. Ct. __, 2007 WL 1661472 (2007).............................................19

Lindh v. Murphy,
    521 U.S. 320 (1997)......................................................................21

Longhi v. Animal & Plant Health Inspection Serv.,
    165 F.3d 1057 (6th Cir. 1999) ....................................................38, 46

Lopez v. Munoz, Hickema & Reed, L.L.P.,
    22 S.W.3d 857 (Tex. 2000)..............................................................25

Lyons v. Ohio Adult Parole Auth.,
    105 F.3d 1063 (6th Cir. 1997), overruled in part on other grounds by
    Lindh v. Murphy, 521 U.S. 320 (1997) ...............................................21

Matter of Izummi,
    22 I. & N. Dec. 169 (1998), 1998 WL 483977 ....................................28

Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc.,
    908 S.W.2d 211 (Tenn. Ct. App. 1995).........................................39, 43

National Ass'n of Mfrs. v. United States Dep't of Labor,
    No. 95-0715, 1996 WL 420868 (D.D.C. July 22, 1996) ..........................20, 21, 22

National Labor Relations Bd. v. Newtown Corp.,

iv

     819 F.2d 677 (6th Cir. 1987) ........................................................................21, 48

New Hampshire v. Maine,
     532 U.S. 742 (2001)..............................................................................................26

Orr v. Hawk,
     156 F.3d 651 (6th Cir. 1998) .............................................................................30

Overall v. Tennessee Valley Auth., In re,
     ARB Nos. 98-111, 98-128, 2001 WL 487725 (Apr. 30, 2001),
     aff'd, 59 F. App'x 732 (6th Cir. 2003)..................................................................33

Pogue v. United States Dep't of Labor,
     940 F.2d 1287 (9th Cir. 1991) ............................................................................37

R.P. Carbone Constr. Co. v. Occupational Safety & Health Review
     Comm'n,
     166 F.3d 815 (6th Cir. 1998) .............................................................................20

Railroad Ventures, Inc. v. Surface Transp. Bd.,
     299 F.3d 523 (6th Cir. 2002) .............................................................................19

Reigel v. Kaiser Found. Health Plan,
     859 F. Supp. 963 (E.D.N.C. 1994)......................................................................26

Rubin v. United States,
     449 U.S. 424 (1981)..............................................................................................24

Rufo v. Inmates of the Suffolk County Jail,
     502 U.S. 367 (1992)..............................................................................................22

Scandia Down Corp. v. Euroquilt, Inc.,
     772 F.2d 1423 (7th Cir. 1985), ..........................................................................51
     cert. denied, 475 U.S. 1147 (1986)

Service, Hosp., Nursing Home & Pub. Employees Union v.
     Commercial Prop. Servs., Inc.,
     755 F.2d 499 (6th Cir. 1985) .............................................................................46

Simon v. Simmons Food, Inc.,
     49 F.3d 386 (8th Cir. 1995) ........................................................................33, 37

Smith v. Chater,
     99 F.3d 780 (6th Cir. 1996) ...............................................................................20

v

Taylor Steel, Inc. v. Keeton,
    417 F.3d 598 (6th Cir. 2005) .................................................................37

Taylor v. Standard Gas & Elec. Co.,
    306 U.S. 307 (1939)..........................................................................38

Technicon Med. Info. Sys. Corp. v. Green Bay Packaging, Inc.,
    687 F.2d 1032 (7th Cir. 1982) ............................................................25

Third Nat'l Bank v. Celebrate Yourself Prods., Inc.,
    807 S.W.2d 704 (Tenn. Ct. App. 1990)................................................52

United States v. Articles of Banned Hazardous Substances,
    34 F.3d 91 (2d Cir. 1994) ...................................................................24

United States v. Bestfoods,
    524 U.S. 51 (1998)......................................................................39, 45

United States v. Cinemark USA, Inc.,
    348 F.3d 569 (6th Cir. 2003) .............................................................25

United States v. Cordova Chem. Co.,
    113 F. 3d 572 (6th Cir. 1997), vacated on other grounds sub nom.
    United States v. Bestfoods, 524 U.S. 51 (1998) ...................................39

United States v. Walton,
    909 F.2d 915 (6th Cir. 1990) .............................................................46

United States v. WRW Corp.,
    986 F.2d 138 (6th Cir. 1993) .......................................................39, 46

Vardanore v. Secretary of Labor,
    141 F. 3d 625 (6th Cir. 1998) ............................................................19

VP Bldgs., Inc. v. Polygon Group, Inc.,
    No. M2001-00613, 2002 WL 15634 (Tenn. Ct. App. 2002)....................39, 43, 47

Wyoming v. United States Dep't of Agric.,
    414 F.3d 1207 (10th Cir. 2005) .........................................................22

Federal statutes and regulations:

Administrative Procedure Act,
    5 U.S.C. § 701 <u>et seq.</u>: .................................................................................19

    5 U.S.C. § 706(2)(A)....................................................................................19

    5 U.S.C. § 706(2)(D)....................................................................................22

    5 U.S.C. § 706(2)(E)....................................................................................19

American Competitiveness and Workforce Improvement Act of 1998,
    Pub. L. 105-277, tit. IV, 112 Stat. 2681.....................................................1, 21, 24

        § 413(a) ..............................................................................21, 24
        § 412(a) ..............................................................................24

Civil Rights Act of 1964,
    tit. VII, 42 U.S.C. § 2000e <u>et seq.</u> .........................................................33

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 ..........................................................2

Immigration and Nationality Act,
    8 U.S.C. § 1101 <u>et seq.</u>:

    § 101(a)(15)(H)(i)(b), 8 U.S.C. § 1101(a)(15)(H)(i)(b)...............................1, 2, 31

    § 212(e), 8 U.S.C. § 1182(e) ......................................................................31

    § 212(n), 8 U.S.C. § 1182(n) ......................................................................1

    § 212(n)(1), 8 U.S.C. § 1182(n)(1) .............................................................2, 26

    § 212(n)(1)(A), 8 U.S.C. § 1182(n)(1)(A) ...................................................2

    § 212(n)(1)(G)(ii), 8 U.S.C. § 1182(n)(1)(G)(ii) ..................................15

    § 212(n)(2), 8 U.S.C. § 1182(n)(2) .............................................................2, 26

    § 212)(n)(2)(C)(ii), 8 U.S.C. § 1182(n)(2)(C)(ii) ...................................45

    § 212(n)(2)(C)(iv), 8 U.S.C. § 1182(n)(2)(C)(iv) ........................3, 17, 33

    § 212(n)(2)(C)(vi)(I), 8 U.S.C. § 1182(n)(2)(C)(vi)......................36, 50

vii

§ 212(n)(2)(C)(vii)(I),
    8 U.S.C. § 1182(n)(2)(C)(vii)(I) .............................................. 3, 16-, 24, 27

§ 212(n)(2)(C)(vii)(II),
    8 U.S.C. § 1182(n)(2)(C)(vii)(II) ...........................................3, 24

§ 212(n)(2)(C)(vii)(III),
    8 U.S.C. § 1182(n)(2)(C)(vii)(III)............................................3

§ 212(n)(2)(C)(vii)(IV),
    8 U.S.C. § 1182(n)(2)(C)(vii)(IV) ...........................................3

§ 214(i)(1), 8 U.S.C. § 1184(i)(1) ................................................2

§ 214(l)(1)(B), 8 U.S.C. § 1184(l)(1)(B) ..................................31

§ 214(l)(1)(D), 8 U.S.C. § 1184(l)(1)(D)...................................9

28 U.S.C. § 1746 ...................................................................................8

42 U.S.C. § 1396b(s).............................................................................47

42 U.S.C. § 1395nn(a) ..........................................................................47

42 U.S.C. § 1395nn(b)(2) ......................................................................47

20 C.F.R (1995):

§ 655.705(c)(4) ...........................................................................13, 21

§ 655.731(c)(1) ...........................................................................30

§ 655.731(c)(3) ...........................................................................34

§ 655.731(c)(4) ...........................................................................34

§ 655.731(c)(7)(i) ........................................................................30

§ 655.731(c)(7)(ii) .......................................................................30

§ 655.731(c)(7)(iii)(C) .................................................................27

§ 655.731(c)(9) ...........................................................................30

viii

§ 655.750(b) ........................................................................................................... 27

§ 655.800(d) .......................................................................................................... 33

20 C.F.R (2001):

Subpart H ................................................................................................................ 1

  § 655.700(a)(3) .................................................................................................. 2

  § 655.705(b) ....................................................................................................... 2

  § 655.705(c)(4) ................................................................................................. 21

  § 655.715 ............................................................................................................ 1

  § 655.731(a)(1) .................................................................................................. 1

  § 655.731(a)(2) .................................................................................................. 1

  § 655.731(a)(2)(iii) .......................................................................................... 26

  § 655.731(c)(1) ................................................................................................. 30

  § 655.731(c)(4) ................................................................................................. 34

  § 655.731(c)(6)(ii) ..................................................................................... 16, 27

  § 655.731(c)(7)(i) ........................................................................................ 3, 16

  § 655.731(c)(7)(ii) ............................................................................................. 3

  § 655.731(c)(9)(ii) ........................................................................................... 30

  § 655.731(c)(9)(iii)(C) .................................................................................... 28

  § 655.731(c)(12) .............................................................................................. 30

  § 655.731(d)(4) ................................................................................................ 24

  § 655.740(c) ..................................................................................................... 27

  § 655.750(b) ..................................................................................................... 27

Subpart I.................................................................................................1

    § 655.801................................................................................3, 33, 36

    § 655.805.............................................................................................36

    § 655.806.............................................................................................36

    § 655.820(a)..........................................................................................4

    § 655.845(b)(3)................................................................................21, 48

    § 655.845(b)(4)....................................................................................48

29 C.F.R:

    Part 18................................................................................................48

    § 18.34(g)..............................................................................................6

    § 18.34(g)(3)....................................................................................6, 51

42 C.F.R:

    42 C.F.R. § 411.352(a)..........................................................................47

    42 C.F.R. § 411.352(f)..........................................................................47

    42 C.F.R. § 411.355(b)..........................................................................47

State regulations:

    Tenn. Code Ann. §  48-101-601 et seq.:........................................................46

    § 48-101-609(a)(1)...............................................................................46

    § 48-101-609(a)(2)...............................................................................46


Miscellaneous:

    144 Cong. Rec. S12752 (Oct. 21, 1998)......................................................17

x

62 Fed. Reg. 28,801 (1997) ...................................................................................31

65 Fed. Reg. 80,110 (2000) ....................................................................................1

65 Fed. Reg. 80,178 (2000) ...................................................................................33

65 Fed. Reg. 80,195 (2000) ...................................................................................34

65 Fed. Reg. 80,198-80,200 (2000) .......................................................................31

H.R. Rep. No. 106-692 (2000)............................................................................1, 29

H.R. Rep. No. 106-1048 (2001)..............................................................................27

## STATEMENT OF THE CASE

A.  <u>Statutory and Regulatory Background</u>

xi

The H-lB visa program of the Immigration and Nationality Act ("INA" or "the Act") is a voluntary program that permits the temporary employment of nonimmigrants to fill specialized jobs in the United States. See 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n), 20 C.F.R. § 655, subparts H and I.[1] The program requires the payment of the "required wage," which is the higher of the actual wage (the wage paid by the employer to all individuals with experience and qualifications similar to that of the H-1B worker for the specific employment in question) or the prevailing wage (the locally prevailing wage rate for the occupation in which the H-1B worker is to be employed). See 8 U.S.C. § 1182(n)(1)(A); 20 C.F.R. §§ 655.715, 655.731(a)(1), (2). The prevailing wage provisions safeguard against the erosion of U.S. workers' wages and moderate any economic incentive or advantage in hiring temporary foreign workers. See, e.g., H.R. Rep. No. 106-692, at *12 (2000) (discussion of DOL's 1996 Office of Inspector General report).

Under the INA, an employer seeking to hire an alien in a specialty occupation,[2] must first submit a Labor Condition Application ("LCA") to DOL. See 8 U.S.C. § 1182(n)(1). The employer attests in the LCA that it will pay the alien the required wage. 8 U.S.C. § 1182(n)(1)(A). DOL must certify the LCA within seven days unless it is incomplete or contains

---

[1] On October 21, 1998, § 212(n) of the INA, 8 U.S.C. § 1182(n) was amended by the American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA"), Pub. L. No. 105-277, tit. IV, 112 Stat. 2681-641, 2681-643 to 2681-651. The United States Department of Labor ("DOL") regulations were amended on December 20, 2000, and went into effect on January 19, 2001. See DOL Interim Final Rule, 65 Fed. Reg. 80,110 (2000). Some events in the instant case occurred under the previous regulation, dated 1995. The cite to the 2001 regulations is provided where the new regulation did not substantively change the requirements with respect to an event that occurred under the old regulation.

[2] The INA defines a "specialty occupation" as an occupation requiring the application of highly specialized knowledge and the attainment of a bachelor's degree or higher. See 8 U.S.C. § 1184(i)(1).

2

"obvious inaccuracies."  8 U.S.C. § 1182(n)(1) (unmarked paragraph preceding 8 U.S.C. § 1182(n)(2)).

After the employer receives the Department's certification of the LCA, it submits a copy of the certified LCA to the Immigration and Naturalization Service ("INS")[3] and petitions for an H-1B classification for the nonimmigrants it wishes to hire.  See 8 U.S.C. § 1101(a)(15)(H)(i)(b); 20 C.F.R. § 655.700(a)(3).  Upon INS approval, the Department of State issues an H-1B visa to the nonimmigrant. See 20 C.F.R. § 655.705(b).[4]

The INA requires the employer to pay the required wage to H-1B nonimmigrants 60 days after the date the nonimmigrant becomes eligible to work for the employer if the worker is already in the country on the date that the H-1B petition is approved.  Further, periods of nonproductive activity must be compensated at the required wage rate.  See 8 U.S.C. §§ 1182(n)(2)(C)(vii)(I),(II), (III).  Under this "no benching" provision, an employer who places an H-1B employee "in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license" must pay the employee full-time wages for all nonproductive time.  8 U.S.C. § 1182(n)(2)(C)(vii)(I); 20 C.F.R. § 655.731(c)(7)(i) (emphasis added).  This provision does not apply if the "nonproductive time [is] due to non-work-related factors, such as the voluntary request of the nonimmigrant for an

---

[3]  Pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2195-97, the adjudication of immigrant visa petitions was transferred from the INS to the U.S. Citizenship and Immigration Services" or "USCIS."

[4]  After INS notifies the employer of its approval of the H-1B petition, if the employee is in the United States, he must leave the United States to obtain the H-1B visa stamp in his or her passport upon return to the United States (AR_07865-66).

3

absence or circumstances rendering the nonimmigrant unable to work."  8 U.S.C. §

1182(n)(2)(C)(vii)(IV).[5]

The statute also contains a whistleblower provision protecting employees who disclose

information relating to statutory violations or cooperate in an investigation.  8 U.S.C. §

1182(n)(2)(C)(iv); see also 20 C.F.R. § 655.801.

B.  Course of Proceedings

The DOL's Wage and Hour Division ("Wage-Hour") conducted an investigation

regarding the employment of 17 H-lB physicians by Dr. Mohan Kutty and various corporate

entities controlled by Dr. Kutty.[6]  Following the investigation, the Wage and Hour Administrator

("Administrator") issued determination letters on April 13, 2001, finding that Dr. Kutty and the

corporate entities had violated the provisions of the INA by willfully failing to pay required

wage rates, failing to make LCAs available for public examination, and failing to maintain

payroll records.  The Administrator also found that Dr. Kutty and the corporate entities

discriminated against nine of the H-lB doctors for engaging in protected activity.  The

Administrator assessed back wages and civil money penalties.  Dr. Kutty and the corporate

---

[5]  The revised regulation explains that an H-1B nonimmigrant need not be paid the required wage for nonproductive status "due to conditions unrelated to employment which take the nonimmigrant away from his/her duties at his/her voluntary request and convenience (*e.g.,* touring the U.S., caring for ill relative) or render the non-immigrant unable to work (*e.g.,* maternity leave, automobile accident which temporarily incapacitates the nonimmigrant.").  20 C.F.R. § 655.731(c)(7)(ii).  Further, the employer's obligation to pay wages ceases if there has been a "bona fide termination of the employment relationship."  Id.

[6]  The subject doctors are: Nazeen Ahmed, Ferdinand Casis, Alexandru Chicos, Srinivasa Chintalapudi, Ahsanul Haque, Ionut Ilie, Madalina Ionescu, Sivalingam Kanagasegar, Rafay Khan, Victor Manole, Dragos Munteanu, Shoaib Naseem, Maqbool Qadir, Vlad Radulescu, Rajesh Rohatgi, Christian Speil, and Vivek Venkatesh.

4

entities requested an administrative hearing on these determinations pursuant to 20 C.F.R. § 655.820(a).

The Administrative Law Judge ("ALJ") conducted a hearing on the case on June 4-8, 18-22, and 25-28, 2001 (AR_07856). Dr. Kutty and the medical clinics were represented by attorneys Katherine Young and Dale Montpelier of Montpelier and Young, P.A. (e.g, AR_04282, 04399, 04403). Additionally, Dr. Kutty appeared on behalf of himself as an individual respondent, and Mr. Basavaraj Hooli, Dr. Kutty's administrator, represented the corporations (AR_04405).

At the close of the June 7th proceedings, Dr. Kutty was admitted to the hospital for a kidney stone, and did not attend the hearing for the remainder of June. (Pet. Br. at 42-43.)[7] On June 8th, Dr. Kutty's counsel requested that the hearing proceed in his absence (AR_05196). Dr. Kutty was discharged from the hospital on June 9th but did not return to the hearing. Medical records show that he went on vacation to India on June 15th. (Pet. Br., Addendum A.)

Further, during the June trial period, attorney Young was eight months pregnant, and represented to the ALJ that she could not work more than eight hours a day; the ALJ accommodated counsel's schedule. When the hearing could not be completed in June, the ALJ postponed the remainder of the hearing, in part, to accommodate counsel's maternity leave from

_____

[7] At the hearing, the ALJ admitted into evidence Dr. Kutty's deposition testimony from a related proceeding (<u>Vivek Venkatesh v. Mohan Kutty</u>, No. 3965 (Chancery Court for Union County, Tenn.) (AR_04416-17, 04423-24; see AR_07864). In the Tennessee case, ten of the seventeen doctors obtained an injunction restraining the enforcement of clauses within their employment contracts with Dr. Kutty that imposed $350,000 penalties. At deposition, Dr. Kutty and the corporations were represented by W. Tyler Chastain, Esq., the attorney providing representation in the instant case (AR_01369).

August 1 to October 31, 2001 (AR_07856 n.2; see AR_01343, 04336, 06713-18, 06881). The hearing was scheduled to resume on November 26, 2001 (AR_01343, 06830).

However, on October 17, 2001, Dr. Kutty's attorneys filed a Notice of Intent to Withdraw as Respondents' Counsel (AR_01343-45). During a November 16, 2001, conference call on the matter, attorney Young explained that the respondents had not paid their bill or replenished their retainer, that they had not been cooperative with counsel's attempts to resume the hearing, and that Dr. Kutty had been out of the country and had not returned by his expected return date of November 13, 2001 (AR_01344). The Administrator objected because he was prepared to complete the trial, and it was uncertain when the case would be completed if Dr. Kutty further delayed in obtaining new counsel (AR_01344-45). The ALJ granted the motion to withdraw and postponed the hearing until December 4, 2001, to give Dr. Kutty and the clinics time to find new counsel, or show cause why they or their representatives could not appear at the hearing. She also ruled that failure to do so could result in "dismissal or default by reason of abandonment." (AR_01345). The ALJ also informed the corporate respondents that they must be represented by counsel to appear at the hearing. Id.

The hearing concluded on December 4-5, 2001 (AR_07856-57). Dr. Kutty appeared as "president of the corporation and individually," and Mr. Hooli appeared as the "administrator of the corporation." (AR_06925). At the beginning of the December 4th proceedings, the ALJ discussed with the parties that, pursuant to 29 C.F.R. § 18.34(g), she had made an error when she stated in her previous order that the corporate respondents must be represented by counsel.[8] She specifically asked Dr. Kutty whether he wished to proceed without counsel:

_____

[8] Under 29 C.F.R. § 18.34(g)(3), an ALJ has authority to deny a person the privilege of

6

ALJ: Dr. Kutty, what is your position with respect to whether you want to seek legal representation to continue the case?

DR. KUTTY:  Well, I will represent myself on this one.

ALJ:  All right.  So, you wish to then proceed without legal counsel?

DR. KUTTY:  Yes, I do.

(AR_06928-29).

At the hearing, most of the exhibits offered by Dr. Kutty were admitted into evidence (AR_07857).  However, on the last day of the hearing, certain new exhibits were not admitted based on grounds such as relevance, surprise, or cumulativeness. [9]  Additionally, on December 10, 2001, after the hearing was concluded, Mr. Hooli attempted to offer into evidence additional new documents purportedly related to hours worked.  The ALJ sustained the Administrator's objection (AR_07857).

The ALJ allowed the parties to file post-hearing briefs, and a new attorney assisted Dr. Kutty in this regard (AR_07857 n.3).  On October 9, 2002, the ALJ issued a Decision and Order, finding that Dr. Kutty and the corporate entities had committed the violations charged in the determination letters.  She ordered Dr. Kutty and the corporate entities to pay the 17 doctors back

---

appearing as a representative of a party.  However, this provision does not apply to any person who appears on his own behalf or on behalf of any corporation of which he is a partner, officer, or regular employee.

[9]  Seven exhibits were excluded (AR_07106). The prehearing order required parties to exchange copies of exhibits by May 25, 2001 (AR_00505-00507).  Some of the new exhibits were introduced after the witnesses had already testified regarding the subject matter contained in the exhibits; others were not included on the required exhibit list (see AR_07181-85, 07194-206, 07209-10).

7

wages totaling $1,044,294.04, and assessed civil money penalties in the amount of $108,800.00 (AR_07956-57).

Dr. Kutty and the corporate entities appealed the Decision and Order to the Department's Administrative Review Board ("ARB" or "Board"), and the decision was affirmed on May 31, 2005.

C. <u>Statement of Facts</u>

Between 1998 and 2000, Dr. Mohan Kutty opened five clinics in Tennessee and hired the 17 H-lB doctors who are the subjects of this case (AR_09081, 07863; <u>see</u> AR_07152). Dr. Kutty signed the LCAs for all 17 doctors as the medical director of the employing corporations and checked the box "to indicate that the employer will comply with" the following statement:

> H-lB nonimmigrants will be paid at least the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question <u>or</u> the prevailing wage level for the occupation in the area of employment, <u>whichever is higher.</u>

(AR_01539); (ETA Form 9035, box 8a) (emphases in original);[10] (<u>see also</u> AR_09085). Dr. Kutty also signed the following attestation on the LCAs:

> DECLARATION OF EMPLOYER. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the information provided on this form is true and correct. In addition, I declare that I will comply with the Department of Labor regulations governing this program . . . .

(<u>Id</u>.) (ETA Form 9035, box 9) (emphasis added); (<u>see also</u> AR_09085).

Additionally, when Dr. Kutty signed the H-1B petitions (filed with the INS) for all 17 doctors, he attested to the following:

---

[10]  <u>See</u> AR_01701, 01728, 01756, 01796-97, 01854, 01891, 01943, 02080, 02121, 02852, 02876, 02913, 02957-58, 03003-04, 03046-47, 03086-87, 03129 --- these citations refer the reader to the LCAs for each doctor.

8

By filing this petition, I agree to the terms of the labor condition application for the duration of the alien's authorized period of stay for H-1B employment.

(AR_01539)[11] (Supplement to Form 1-129, Section 1).[12]

The applicable prevailing wage rates ranged from $52,291 to $115,357, but the doctors generally received far less (AR_07936; see AR_01943, 02852).[13] Despite signing the LCAs and H-lB petitions and attesting that he would pay the prevailing wage rates, Dr. Kutty did not intend to pay the prevailing wage rates (AR_07928, 07944; see AR_01433-35, 01526-29, 01578-80, 04525-27, 06195, 06280-81). Dr. Kutty planned to underpay the doctors, as he expected the clinics to lose money for three to five years (AR_07863; see AR_01385, 04526-27, 05842, 06139-41, 06585, 06637-38, 06778-80). Accordingly, he entered into employment contracts with the H-lB doctors, providing for a salary lower than many of the prevailing wage rates, and he did not intend to pay even these rates (AR_07863; see AR_01433-35, 01578, 04702-03, 05146-47, 05332-33, 05858-59, 06139-44, 06636-37, 06782-83, 07160). The contracts provided an annual salary of $80,000, and an incentive bonus of 25% of revenues billed exceeding $250,000 (AR_01704, 01763, 01806, 01859, 01900, 01949, 01969, 02014, 02085, 02131, 02860, 02882, 02917, 02963, 03015, 03055, 03094, 07863). In most cases, the doctors were not paid the $80,000 salary, and no bonuses were ever paid (AR_07928-36; see AR_01575). Although

---

[11] See AR_01738, 01762, 01804, 01858, 01898, 01948, 02013, 02083, 02128, 02855, 02881, 02962, 03010, 03053, 03092, 03134.

[12] In most cases, the doctors used the services of Dr. Kutty's in-house counsel, Kalina Sarmov, to assist them in obtaining the necessary approvals from INS and DOL (AR_07866). Dr. Kutty told some of the doctors to use Ms. Sarmov because of problems he was having with other lawyers (AR_07866; see AR_01536-38).

[13] The fact that the doctors generally received less than the LCA amounts is not disputed.

9

the doctors moved to Tennessee to start work, jobs were not always available when they arrived. (See, e.g., AR_05082-88, 05141-47, 06630-38).

The 17 doctors originally entered the United States on "J-l" study/residency visas, which required them to return to their home country for two years upon completion of their medical education (AR_09081, 07864). See 8 U.S.C. § 1182(e), (j)(l). They could obtain a waiver of the requirement to return home if they would subsequently work for three years in an "underserved" area --- a geographic area with a shortage of health care professionals --- as designated by the Secretary of Health and Human Services (known as the "State 20" program) (AR_09081-82, 07864-65). See 8 U.S.C. § 1184(l)(1)(D). The application for a J-l waiver and H-lB petition require separate applications to INS, and obtaining the waivers was a prerequisite to Dr. Kutty's obtaining approval of the doctors' H-1B petitions (AR_07865, 07925). The doctors used the services of a company called Health Impact to complete the application for the J-l waiver, often at the suggestion of Dr. Kutty, or his in-house counsel, Ms. Sarmov  (AR_07870-71; see AR_04697, 05207-08, 05326, 05989-90, 06620, 06757-59).

Dr. Kutty practices medicine in Florida under the corporate identity Center for Internal Medicine, Inc., a Florida corporation (AR_07864; see AR_01507). Dr. Kutty and his wife, Sheela Kutty, jointly own the Florida corporation as tenants in the entirety, and are the only officers and directors (AR_07864; see AR_01508, 01628-40).

The Florida corporate office handled the administration for all of Dr. Kutty's Florida and Tennessee operations (AR_07864; see AR_01441, 05757-58, 05809). However, 13 other corporate entity names were used in employing the H-lB doctors (AR_07947-50). These names were often used interchangeably with respect to employment of the same doctor. Id. For

10

example, Dr. Chicos's LCA lists "Sumeru Health Care Group" as the employer, his paychecks were issued by "Sumeru Health Care Group, Inc." and by "Center for Internal Medicine and Pediatrics, Inc.," and his W-2 was issued by "Center for Internal Medicine and Pediatrics, P.C." Dr. Chicos was terminated by "Maya Health Care." (AR_01796, 01818, 01829, 01836).

Dr. Kutty made all major decisions about the clinics, including how many staff would be hired. He hired the doctors and decided how much they would receive for each paycheck (AR_07864; see AR_01410-11, 01414-16, 01430). The Tennessee employees would call Dr. Kutty or his wife with questions, and Mrs. Kutty had to go to her husband before any decisions were made. Dr. or Mrs. Kutty signed all checks. Id. If there was a problem with billing, patients had to call Florida (AR_06725-26).

The H-1B doctors worked diligently to establish the Tennessee clinics and build up patient caseloads (AR_07871, 07873-74, 07880-86, 07890-91, 07894, 07896-99, 07901-05, 07911-14, 07916, 07926-27, 07939). There were, however, many problems with Florida's handling of billing for the Tennessee clinics (AR_07867, 07870; see AR_04534-35, 06726, 06734-35, 06741-45; see also AR_01451). The clinics were operating at a deficit (AR_09082, 06815; see AR_06815). Dr. Kutty and his administrator, Mr. Hooli, blamed the doctors for the clinics' financial problems (AR_07867, 07869, 07925-27, 07940; see AR_05959-61, 07118-36, 07161-66, 07172-75, 07187-88; see also 01391, 01399-406). Dr. Kutty decided to cut the doctors' salaries until they started seeing more patients (AR_07867, 07938, 09082, 09091; see AR_07127, 07164-65; see also AR_01405-06).

11

Eight of the doctors[14] hired attorney Robert Divine, who, on February 14, 2001, wrote a letter on their behalf demanding payment of amounts due them, stating in part:

> [T]hey hereby demand immediate payment of all amounts due, being the difference between the amounts previously paid and the rate of $115,000 per year as set forth in. . . the labor condition application ("LCA"). . . . If you fail to tender payment of such amounts within one week . . . the Doctors will notif[y] . . . the U.S. Department of Labor.

(AR_03303-04) (footnote omitted); (see AR_09082). Mr. Divine also cited the statute's anti-discrimination and "no benching" provisions (see infra). Id. None of the doctors represented by Mr. Divine was paid thereafter except for one partial payment (AR_09082, 07868, 07872; see AR_04526, 04530, 04540-41, 04546-47, 05235-36, 05267, 05618-19, 05916-17, 06077-79, 06099-100, 06171-72, 06321-22, 06673-74, 06696; see also AR_02176, 02997, 03403, 03407, 03415, 03481). By contrast, the doctors who did not complain received paychecks (AR_06602-03; see AR_01779, 01786, 02106-10, 03543-47). Additionally, Dr. Kutty sent letters to five of the doctors named in the letter, accusing them of falling short of their duties (AR_01966, 02033, 03302, 03396-97, 03486-87).

On February 28, 2001, Mr. Divine filed a complaint with DOL on behalf of the same eight doctors (AR_09082, 07939; see AR_03165-75). On March 19, 2001, DOL sent Dr. Kutty a letter by facsimile stating that it would be conducting an investigation on March 21, 2001 (AR_07939; see AR_03459-60, 03548-49). Accordingly, on March 21st, Wage-Hour conducted an on-site record inspection at Sumeru Health Care Group (AR_09082, 06449, 06452). On that same day, Mr. Divine faxed a letter to Dr. Kutty demanding that two additional doctors --- Drs.

---

[14] Doctors Chicos, Venkatesh, Speil, Khan, Ilie, Ionescu, Qadir, and Naseem (AR_07938, 09092 n.9; see AR_ 03303-04).

12

Rohatgi and Haque --- receive back wages owed them (AR_07916; see AR_03305-10).[15]  Later

that day, Dr. Kutty fired seven of the ten doctors represented by attorney Divine (AR_09082,

07939, 09093 n.11; see AR_01818, 01908, 01965, 02032, 02147, 02998, 03113).[16]  He retained

the other three complainants (Drs. Naseem, Rohatgi, and Venkatesh) to keep the organization

"viable," as well as the three doctors who were not represented by Mr. Divine (AR_07169,

07916).  Ultimately, Drs. Naseem, Rohatgi, and Venkatesh notified Dr. Kutty that they

considered their employment contracts to be in breach because of Dr. Kutty's failure to pay

wages (AR_07894, 07904, 07915; see AR_04603, 04656; see also AR_03121-22, 03399-400).

D.  Decisions Below

    1.  Decision of the Administrative Law Judge

On October 9, 2002, ALJ Alice M. Craft issued a 104-page Decision and Order,

upholding the Administrator's determinations (AR_07854-07964).  The ALJ found that the

provisions of the American Competitiveness and Workforce Improvement Act ("ACWIA") for

which the employer was held responsible (protection for whistleblowers, a prohibition against

"benching" H-1B workers for business reasons or due to the employee's lack of a permit or

license, and increased civil penalties), were in effect during the relevant periods (AR_07859-61).

Specifically, although Congress specified effective dates for some sections of ACWIA, it did not

do so for the provisions applicable to this case (AR_07860).  Thus, these provisions became

---

[15]  Mr. Divine also amended the DOL complaint to add Drs. Rohatgi and Haque (AR_01888, 03043).

[16]  Drs. Chicos, Haque, Ilie, Ionescu, Khan, Qadir, and Speil.

effective on October 21, 1998, the date ACWIA was signed into law by the President. The violations took place after ACWIA went into effect (AR_07861).[17]

The ALJ rejected Dr. Kutty's contention that INS erred in approving the H-lB visas and should therefore bear the consequences of Dr. Kutty's failing to pay the required wage rates (AR_07927). Specifically, according to the ALJ, it was permissible for INS to issue the H-lB visas before the doctors obtained Tennessee medical licenses, because the INA contains a "no benching" requirement. All of the doctors did eventually obtain their Tennessee medical licenses and other required credentials (AR_07927-28). The ALJ concluded that even if the H-lB visas should never have been granted, this does not relieve Dr. Kutty from paying back wages, because that would penalize the H-lB doctors for Dr. Kutty's misrepresentations (AR_07928).

The ALJ also rejected the argument that the LCAs should have been denied because of inconsistencies between the wages stated on the LCAs and on the employment agreements (AR_07927-28). There was no evidence that Dr. Kutty submitted the employment agreements, along with the LCAs, to DOL; indeed, the regulations require the employer to submit only the LCA form promulgated by DOL. The ALJ also found that Dr. Kutty never intended to pay the wage rates set forth in the LCAs (AR_07928).

With respect to reimbursement for business expenses, the ALJ held that the amended regulations explicitly provide that preparation and filing of the LCA and H-lB petition are the employer's business expenses. Obtaining a J-1 waiver is a prerequisite to securing approval of

_____

[17] The ALJ also noted that all of the LCAs, except for that of Dr. Chintalapudi, were certified by DOL after ACWIA went into effect, and all of the H-1B visas were approved after ACWIA's effective date. It is the granting of the H-1B visa which triggers the obligations of the employer to the employee, including the start of employment. See 20 C.F.R. § 655.705(c)(4)(1995) and (2001) (AR_07860-61).

14

the H-lB petition, so it was "a reasonable interpretation of the law and the regulations, and within the Secretary's discretion," to assess these costs. (AR_07923-25).

With respect to the retaliation claims, the ALJ held, based on her credibility determinations, that Dr. Kutty and the corporate entities committed two discrete acts of discrimination against the doctors: (1) when Mr. Divine demanded payment from Dr. Kutty of the wages required by the INA on behalf of eight of the doctors, Dr. Kutty stopped paying any salary to the eight; and (2) when they complained to DOL, Dr. Kutty fired seven of the ten doctors then represented by Mr. Divine (AR_07925-27, 07937-38). With respect to the first act of discrimination, the ALJ found that Dr. Kutty's testimony was "an admission that the doctors' salary was withheld because Mr. Divine notified Dr. Kutty that they had been paid less than the amount required by law" (AR_07939). With respect to the second act of discrimination, the ALJ concluded that "retaliatory motive was at least a contributing cause to the terminations," and that "[p]utting Dr. Kutty's testimony in the best light," the decision to terminate the doctors was "inextricably linked to their having complained to Dr. Kutty and the DOL about the failure to pay them the salary required by the INA" (AR_07941). The ALJ further found that Dr. Kutty failed to prove that he would have fired the doctors even had they not complained to him and DOL (AR_07937, 07941).

Finally, the ALJ held that piercing the corporate veil is appropriate in this case (AR_07954). She found that the corporations were undercapitalized and a sham, and "had no mind, will, or existence of their own." Id. Dr. Kutty's "domination" of the corporate entities was used to "perpetrate violations of statutory duties." Id. That domination was "apparent from Dr.

15

Kutty's own testimony that he alone owned, controlled and operated all of the named corporations, and freely treated and shared personal and corporate assets as his own." Id.

    2. Decision of the Administrative Review Board

On May 31, 2005, the Administrative Review Board issued a Decision and Order affirming the ALJ's decision (AR_09080-102). The Board agreed with the ALJ's rejection of Dr. Kutty's arguments regarding the Government's culpability for approving the LCAs and H-1B petitions. With respect to DOL, it noted that the statute requires LCA approval unless the LCA is "incomplete or obviously inaccurate." 8 U.S.C. § 1182(n)(1)(G)(ii). Thus DOL did not err by certifying the LCAs (AR_09084-85).

The ARB further rejected the argument that INS erred by approving petitions that did not contain evidence that the doctors had obtained a Tennessee medical license as required by INS regulations (AR_09085-86). Under the INA's "no benching" provisions, the Act unambiguously requires that the employer pay the required wage even if the H-1B nonimmigrant is in a "nonproductive status" because of "lack of a permit or license." 8 U.S.C. § 1182(n)(2)(C)(vii)(I); 20 C.F.R. §§ 655.731(c)(6)(ii), (7)(i).[18] Further, Tennessee does not grant a medical license until the nonimmigrant has obtained a valid visa (AR_09086 n.7; 07928; see AR_04825-26, 05865, 06264). Hence, the Board concluded that the INS reasonably interpreted the Act as permitting the issuance of the visa before the medical license was obtained, and should be accorded deference. See Immigration and Naturalization Service v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999); Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

---

[18] The ARB rejected Dr. Kutty's assertion that the ALJ applied the "no benching" regulations that had been enjoined by a district court in 1996. Rather, the ALJ applied the ACWIA statutory provisions (AR_09086 n.6).

16

Finally, Dr. Kutty voluntarily subjected himself to the requirements of the H-1B program and secured the benefits of the program --- the right to hire the nonimmigrant alien doctors. Thus, the Board stated he is estopped from subsequently contending that the LCAs and H-1B petitions should not have been approved. (AR_09085-87).

Additionally, the Board concluded that the ALJ correctly determined that fees paid by the doctors for obtaining H-1B visas and J-1 waivers were business expenses, properly charged to Dr. Kutty, under both the pre and post-ACWIA regulations (AR_09089). The preamble to the post-ACWIA regulations explains that attorneys' fees and other expenses associated with the filing of an LCA and H-1B petition are examples of employer's business expenses. 65 Fed. Reg. 80,199 (2000). The Board agreed with the ALJ that the H-1B employer has the responsibility to submit the H-1B petition, and issue H-1B certifications and approvals; the record provided examples where Dr. Kutty did so with respect to the alien doctors. Additionally, no fees were assessed against Dr. Kutty for tasks that were performed by the attorneys that were personal to the doctors or clearly in the interest of the doctors (AR_09089-90). The Board also agreed with the ALJ's finding that the assessment of J-1 waiver fees and costs was a reasonable interpretation of the Act and within the Administrator's discretion (AR_09090-91).

The Board also affirmed that Dr. Kutty discriminated against the alien doctors under 8 U.S.C. § 1182(n)(2)(C)(iv), which "'essentially codifies current [DOL] regulations concerning whistleblowers'" (AR_09091-94) (quoting 144 Cong. Rec. S12752 (Oct. 21, 1998) (statement of Sen. Abraham)). The first act of discrimination occurred when Dr. Kutty withheld the pay of eight doctors. The Board found that the Administrator proved by a preponderance of the evidence that the doctors engaged in protected activity (submitting a letter to Dr. Kutty through

17

an attorney demanding that Dr. Kutty pay the salaries owed, or DOL would be notified); that Dr. Kutty knew about the activity (Dr. Kutty received the letter); and that Dr. Kutty took adverse action against the doctors because of their protected activity (by ceasing to pay any salary to the doctors after receiving the letter) (AR_09091-94). Further, the Board found that the preponderance of the evidence demonstrated that Dr. Kutty's proffered reason for not paying the doctors, i.e., that they were not fulfilling the terms of their contract, was pretextual, and that "[the] real reason for not paying them was Devine's [*sic*] letter" (AR_09093).

The Board agreed that a second act of discrimination occurred when Dr. Kutty fired seven doctors (AR_09093-94). The Board found that both the doctors' complaint to DOL and their interviews with Wage-Hour constituted protected activity. The Board agreed that Dr. Kutty was aware that the doctors had filed a DOL complaint and that DOL had begun an investigation. Finally, the Board concluded that the Administrator proved by a preponderance of the evidence that Dr. Kutty discharged the doctors, at least in part, because of the DOL complaint and the investigation, and that Dr. Kutty could not prevail under a dual motive analysis.

The Board also affirmed that the ALJ appropriately "pierced the corporate veil" under Tennessee common law, finding Dr. Kutty personally liable for back wages and civil money penalties (AR_09096-97). As the ALJ found, the Tennessee corporations were "undercapitalized," there no evidence that Dr. Kutty issued stock certificates for the corporations, Dr. Kutty was the sole owner with sole control over the corporate entities, Dr. Kutty made all decisions regarding the corporations and their administration was centralized, the assets of the corporations were interchangeable, and their dealings were not at arms length.

### ISSUES PRESENTED

18

- Whether ACWIA's benching prohibition applied to Dr. Kutty and the medical clinics.

- Whether the approval by the Department of Labor and the Immigration and Naturalization Service of allegedly "defective" LCAs and H-lB petitions relieved Dr. Kutty and the corporate entities of their responsibilities under the Immigration Act, including that of paying the required wage rate.

- Whether the Department of Labor properly ordered that Dr. Kutty reimburse the H-1B doctors for their payment of his business expenses.

- Whether Dr. Kutty and the corporate entities retaliated against the H-lB doctors in violation of the INA.

- Whether the ALJ erred in piercing the corporate veil of the medical clinics and assessing personal liability against Dr. Kutty

- Whether the Administrative Law Judge's conduct of the hearing deprived Dr. Kutty of his right to procedural due process.

19

**ARGUMENT**

1. <u>Standard of Review</u>

This case is before the Court for review of the agency determination pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 <u>et seq.</u>  Accordingly, the Board's decision must be affirmed if it is supported by substantial evidence and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (E).  <u>See Railroad Ventures, Inc. v. Surface Transp. Bd.</u>, 299 F.3d 523, 548 (6th Cir. 2002); <u>Vardanore v. Sec'y of Labor</u>, 141 F.3d 625, 630 (6th Cir. 1998).

Under the arbitrary and capricious standard, the scope of review is very narrow. <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974); <u>Railroad Ventures</u>, 299 F.3d at 547.  The reviewing court must consider whether there was a "rational connection between the facts found and the choice made" and should uphold an agency decision "when it is possible to offer a reasoned, evidence-based explanation for a particular outcome." <u>Railroad Ventures</u>, 299 F.3d at 548 (internal quotation marks and citations omitted).

Further, an agency's interpretation of the statutes and regulations it administers is entitled to "considerable weight and due deference . . . unless its statutory construction is plainly unreasonable."  <u>Railroad Ventures</u>, 299 F.3d at 548 (internal quotation marks and citation omitted); <u>see also</u>, <u>Long Island Care at Home, Ltd. v. Coke</u>, 127 S. Ct. 2339, 2345-46, 2349 (2007); <u>Auer v. Robbins</u>, 519 U.S. 452, 457, 461 (1997).  Judicial deference is particularly appropriate in the immigration context.  <u>See Aguirre-Aguirre</u>, 526 U.S. at 424-25; <u>Espejo v. Immigration & Naturalization Serv.</u>, 311 F.3d 976, 978-79 (9th Cir. 2002) (same).

20

The ARB's factual determinations (largely based on the ALJ's findings) "must be affirmed if they are supported by substantial evidence on the record as a whole. . . . Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. It is such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n, 166 F.3d 815, 818 (6th Cir. 1998). Importantly, the substantial evidence standard is further narrowed in the context of immigration law -- the agency's finding can be reversed "only if a reasonable factfinder would have to reach another conclusion." Smith v. Chater, 99 F.3d 780, 782 n.3 (6th Cir. 1996).

2.    The Secretary properly applied ACWIA's no benching provision to Dr. Kutty and the medical clinics.

Dr. Kutty argues that, in 1995, the Secretary issued regulations prohibiting benching, and that the enforcement of those regulations was enjoined in National Association of Manufacturers v. United States Department of Labor, No. 95-0715, 1996 WL 420868 (D.D.C. July 22, 1996) ("NAM"). Dr. Kutty also argues that the statutory benching provision, enacted in 1998, was applied retroactively. (Pet. Br. at 14-18.) However, Dr. Kutty failed to raise these issues before the Administrative Review Board (AR_08136-55, 08375-08407); thus his argument is waived.[19] See Hix v. Director, Office of Workers' Comp. Programs, 824 F. 2d 526, 527 (6th Cir. 1987) (holding "that even if a claimant properly appeals some issues to the Board, the claimant may not

------

[19]  Eight months after the briefing schedule had closed, Dr. Kutty 's new attorney filed a motion to extend the time for filing a supplemental brief and to enlarge issues, and referenced the NAM injunction (AR_08876, 08940-08941, 09007). However, the Board found that there was no good cause to allow Dr. Kutty to raise new issues at that late date (AR_08940-08941). Dr. Kutty filed a motion for reconsideration, and the Board allowed Dr. Kutty to submit an additional brief only with regard to the issue of piercing the corporate veil (AR_09026, 09015-09016, 09052-09054, 09067-09078).

obtain review of the ALJ's decision on any issue not properly raised before the Board.");

National Labor Relations Bd. v. Newtown Corp., 819 F.2d 677, 678 (6th Cir. 1987) (same).[20]

      In any event, Dr. Kutty's arguments are meritless. As the ALJ concluded, the Administrator did not enforce the enjoined regulations against Dr. Kutty and the clinics. Rather, the Administrator applied the INA's no benching provision (codified in ACWIA). This provision became effective on October 21, 1998, before the benching violations at issue in this case occurred. Specifically, § 413(a) of ACWIA, 112 Stat. at 2681-647, prohibits benching. Congress did not provide an effective date for § 413; hence it became effective upon enactment --- on October 21, 1998. See Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991) ("It is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment."); accord Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1066-67 (6th Cir. 1997), overruled in part on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997). Further, all of the H-1B visas were approved after ACWIA's effective date. The employment relationship did not begin until the H-1B visas were approved. See 20 C.F.R. 655.705(c)(4) (1995) and (2001); (AR_007859-61, 09086 n.6), cf. CDI Info. Servs., Inc. v. Reno, 101 F. Supp. 2d 546, 550 (E.D. Mich. 2000) (NAM inapplicable where INS did not rely on invalidated regulation), vacated on other grounds, 278 F.3d 616 (6th Cir. 2002).

      Nevertheless, Dr. Kutty argues that, in light of NAM, the Secretary cannot enforce ACWIA's no benching provision because "injunctions, by definition, are permanent until

---

[20] Pursuant to 20 C.F.R. § 655.845(b)(3), the petitioner must specify the issues to be reviewed by the ARB.

22

dissolved." (Pet. Br. at 15-16.)[21] However, the court enjoined enforcement of the agency's 1995 "no benching" regulation because it had not been promulgated pursuant to notice and comment, as required by 5 U.S.C. § 706(2)(D). NAM, 1996 WL 420868, at *13, *18, *20, Order and Final Judgment at *1. In 1998, Congress remedied the regulatory problem by specifically providing, in the statutory text, that benching is prohibited. That statutory provision was immediately enforceable, regardless of whether the injunction pertaining to the regulation was dissolved.

Dr. Kutty contends that, pursuant to Landgraf v. USI Film Products, 511 U.S. 244 (1994), the Secretary engaged in "an impermissible retroactive application of the statute," because he submitted most of the LCAs prior to ACWIA's enactment or prior to the issuance of the revised regulations. (Pet. Br. at 15-17.) In Landgraf, the Court found that amendments to the Civil Rights Act of 1964, enacted while a case was pending on appeal, did not apply to that case. 511 U.S. at 247. The Court was concerned that applying a law other than what was in effect at the time the violation occurred, could have "important consequences, including the possibility that trials completed before its enactment would need to be retried." 511 U.S. 258-59; see also 511 U.S. at 250. Nevertheless, the Landgraf Court made clear that a statute does not operate retrospectively in a case such as the instant case, where the violations occur after the law goes into effect, even though certain conduct (such as submitting the LCAs and H-1B petitions) occurred prior to the statute's enactment:

---

[21] Dr. Kutty cites specific cases where injunctions have been dissolved when there has been a change in the law, but none relate to a situation similar to this case. For example, Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992) involves dissolution of a consent decree because of a change in facts and decisional law. Furthermore, the case on which Dr. Kutty primarily relies, Wyoming v. United States Dep't of Agric., 414 F.3d 1207, 1211 (10th Cir. 2005), is inapposite because it involves the issue of mootness where an agency rule that is the subject of an appeal has been replaced by another rule.

23

Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards. ("If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever"). Moreover, a statute "is not made retroactive merely because it draws upon antecedent facts for its operation."

Id. at 270 n.24 (citations omitted),[22] see Fleming v. Rhodes, 331 U.S. 100, 107 (1947) (noting that, "Immunity from federal regulation is not gained through forehanded contracts. Were it otherwise the paramount powers of Congress could be nullified by 'prophetic discernment.'") (citations omitted); Federal Housing Admin. v. Darlington, Inc., 358 U.S. 84, 91 (1959) (same); Brewing Corp. of Am. v. Cleveland Trust Co., 185 F.2d 482, 485 (6th Cir. 1950) (same).[23]

Dr. Kutty is attempting to do just what the Supreme Court admonished against -- to render himself immune from changes in the law, although he committed the benching violation after the law was passed. This is analogous to an employer contending that he need not comply with amendments to the Fair Labor Standards Act that increase the minimum wage because he hired the employees while the lower minimum was in effect. Indeed, Dr. Kutty chose to employ the doctors and violate the law in effect at the time that the employees were working for him.

_____

[22] This proposition has been applied with respect to enforcement of amendments to the INA. See Fernandez-Vargas v. Gonzales, 126 S. Ct. 2422, 2433 (2006) (citing Landgraf, supra, the Court found that "the branch of retroactivity law that concerns us here is meant to avoid new burdens imposed on completed acts, not all difficult choices occasioned by new law.")

[23] Cf. East N.Y. Sav. Bank v. Hahn, 326 U.S. 230, 232 (1945) ("[W]hen a widely diffused public interest has become enmeshed in a network of multitudinous private arrangements, the authority of the State 'to safeguard the vital interests of its people' is not to be gainsaid by abstracting one such arrangement from its public context and treating it as though it were an isolated private contract constitutionally immune from impairment.") (citations omitted).

24

Finally, Dr. Kutty contends that ACWIA could not be implemented until final regulations were issued on December 20, 2000.  (Pet. Br. at 16-17.)[24]  However, regulations were not required to make the explicit requirements of section 413 enforceable.[25]  See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (stating,"When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" quoting Rubin v. United States, 449 U.S. 424, 430 (1981)); United States v. Articles of Banned Hazardous Substances, 34 F.3d 91, 98 (2d Cir. 1994) (observing that the Secretary "is not required to address an issue in the regulations that Congress has already addressed in the statute.").  In enacting ACWIA, Congress explicitly stated its intention to delay implementation of certain sections of the legislation until regulations were promulgated.  For instance, ACWIA section 412(a), which amended the INA by adding new LCA attestation requirements for certain types of employers, was made applicable to LCAs filed "on or after the date final regulations are issued to carry out such amendments." 112 Stat. at 2681-642 to 2681-643, 2681-645.  No such restriction, however, was placed on the effective date of section 413.  Id. at 2681-645 to 2681-651.  As the Sixth Circuit has noted, an agency's enforcement of a statutory provision "cannot be defeated on the ground that the agency has failed to promulgate a more specific regulation. . . . The choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." United States v. Cinemark USA, Inc., 348 F.3d 569, 580 (6th Cir. 2003) (internal quotation marks and citations omitted), see American Power & Light Co. v. Securities & Exch. Comm'n, 329 U.S. 90, 106 (1946).

---

[24]  Some violations occurred even after the new regulations went into effect.

[25]  See 8 U.S.C. §§ 1182(n)(2)(C)(vii)(I), (II).

25

3.   The approval by the Department of Labor and the Immigration and Naturalization Service of allegedly "defective" LCAs and H-lB petitions did not relieve Dr. Kutty and the corporate entities of their responsibilities under the Immigration Act.

Dr. Kutty contends that he should not have been allowed to obtain H-1B visas for the doctors.  (Pet. Br. at 19, 24, 33.)  Dr. Kutty, however, is estopped from arguing that because the LCAs and petitions should not have been approved in the first place, he is not liable (AR_09087).  In Bear Stearns Government Securities, Inc. v. Dow Corning Corp., 419 F.3d 543 (6th Cir. 2005), the Sixth Circuit explained that the doctrine of "quasi-estoppel."  The court states that "quasi-estoppel" applies where "'it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit'" Id. at 553 (quoting Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 864 (Tex. 2000). See Technicon Med. Info. Sys. Corp. v. Green Bay Packaging, Inc., 687 F.2d 1032, 1034 (7th Cir. 1982) (noting that statutory estoppel requires:  "1) assertion by a party of entitlement to a statutory right or privilege; 2) the receipt by that party of an actual benefit pursuant to the statute; 3) subsequent assertion by that party which is inconsistent with entitlement to the statutory benefit previously received."); Johnson v. Georgia Dep't of Human Res., 983 F. Supp. 1464, 1470 (N.D. Ga. 1996) (admonishing that a party advocating two sharply contradictory positions "will not be permitted to 'speak out of both sides of his mouth with equal vigor and credibility before this court'" (quoting Reigel v. Kaiser Found. Health Plan, 859 F. Supp. 963, 970 E.D.N.C. 1994)).[26]

---

[26]  Cf. New Hampshire v. Maine, 532 U.S. 742, 749 (2001) ("'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the

In this case, Dr. Kutty utilized the H-1B program by filing the LCAs and H-lB petitions and certifying, under penalty of perjury, that he was providing correct information. As a result, he obtained the benefits of the H-lB program and was given permission to hire the doctors. Under the Sixth Circuit's "quasi-estoppel" doctrine, he cannot now absolve himself of responsibility for his violations.

Further, with respect to DOL's approval of the LCAs, which Dr. Kutty contends are inconsistent with employment agreements (Pet. Br. at 24-25, 33), the employer is not required to submit employment agreements to DOL, and there is no evidence that Dr. Kutty did so in this case (AR_09084-85, 07928).[27] Rather, Dr. Kutty attested on the LCAs that he would pay the higher of the actual wage or the prevailing wage for the occupation in the area of employment, and listed an appropriate prevailing wage. See 20 C.F.R. §§ 655.731(a)(2)(iii), (d)(4); see Statement of Facts, supra. Significantly, the INA does not allow DOL to reject an LCA unless "the application is incomplete or obviously inaccurate." 8 U.S.C. § 1182(n)(1) (unmarked paragraph preceding 8 U.S.C. § 1182(n)(2)). The regulations further provide that "DOL is not the guarantor of the accuracy, truthfulness or adequacy of a certified labor condition application. The burden of proof is on the employer to establish the truthfulness of the information contained on the labor condition application." 20 C.F.R. § 655.740(c). In this case, the LCAs were neither incomplete nor obviously inaccurate. Thus, there was no basis to disapprove them.[28] Finally,

---

prejudice of the party who has acquiesced in the position formerly taken by him'") (citation omitted).

[27] In fact, seven employment agreements did not list salaries less than what was stated on their corresponding LCAs (AR_09084).

[28] As noted by Congress, DOL is authorized to investigate non-obvious errors on LCAs only in

27

Dr. Kutty could have later withdrawn the LCAs, but he did not.  See 20 C.F.R. § 655.750(b)

(1995) and (2001).

With respect to INS's approval of the petitions prior to the doctors receiving Tennessee

licenses, the INA explicitly recognizes that H-lB workers must be regarded as employees even

before they obtain licenses, by prohibiting an employer from placing a worker in nonproductive

status because of the worker's "lack of a permit or license."  8 U.S.C. § 1182(n)(2)(C)(vii)(I).  Cf.

20 C.F.R. § 655.731(c)(6)(ii) ("Matters such as the worker's obtaining a State license would not

be relevant to [the] determination [of whether the nonimmigrant is eligible to work for the

employer].").  Moreover, as discussed by the ALJ and ARB (AR_07927-28, 09086-87), the State

of Tennessee would not grant the license without the visa, so the INS acted within its broad

discretion in approving the petitions.  See Aguirre-Aguirre, 526 U.S. at 424; Espejo, 311 F.3d at

978-79; CDI Info., 101 F. Supp. 2d at 549.[29]

---

enforcement actions such as this, not upon initial review:

> Because of the need of employers to bring H-lB aliens on board in the shortest possible
> time, the H-lB program's mechanism for protecting American workers is not a lengthy
> pre-arrival review of the availability of suitable American workers (such as the labor
> certification process necessary to obtain most employer-sponsored immigrant visas) .
> Instead, an employer files a "labor condition application" with the Department of Labor
> making certain basic attestations (promises) and the Department then investigates
> complaints alleging noncompliance.

H.R. Rep. No. 106-1048, at 212 (2001).

[29]  Dr. Kutty argues that, pursuant to Matter of Izummi, 22 I. & N. Dec. 169 (1998), 1998 WL
483977, INS should have revoked approval of the H-1B petitions because they did not contain
evidence that the doctors had state medical licenses, as required by INS regulations.  (Pet. Br. at
26-28.)  However, as discussed above, whether INS was correct in approving the H-1B petitions
or had authority to revoke the petitions, is irrelevant to the correctness of the Secretary's
determination that Dr. Kutty was obligated to pay the required wage rate to the H-1B doctors,
and failed to do so.  Further, Dr. Kutty noted in a number of the H-1B petitions that Tennessee

28

Dr. Kutty also claims that "the H-1B physicians breached their employment agreements" and that Tennessee law applies to the contracts. (Pet. Br. at 19, 27.) However, Labor Condition Applications and the federal INA requirements determine the payment of wages and civil money penalties in this case. The only exception to this is with respect to the requirements for piercing the corporate veil, which was done pursuant to Tennessee common law. See discussion, infra.

Further, after conducting a lengthy hearing, the ALJ discredited Dr. Kutty's argument that the doctors were not performing their duties:

> The weight of the evidence, including consistent testimony from the doctors and staff, who were separated during the hearing, supports the conclusion that the doctors were fulfilling their obligations and trying to build their practice despite difficult conditions, including insufficient planning, over-expansion, poor management of key functions such as billing, and under-funding of the clinics by Respondents.

(AR_07927; see also AR_07926, 07940-41.) Indeed, Dr. Kutty's proffered reason for not paying the doctors, i.e., that they were not fulfilling the terms of their contract, was found to be pretextual (AR_07926-27, 07940-41, 09093).

In a similar vein, Dr. Kutty argues that because physicians require licensing and other credentials, they should be treated differently than other H-1B workers. (Pet. Br. at 24.) However, the statute does not except physicians from the benching prohibition. Moreover, there are many work activities that can be performed by physicians before they get credentialed. In this case, the doctors accompanied other doctors to see patients, treated patients who were willing to be seen without insurance approvals, reviewed medical journals, shopped for medical equipment and supplies, determined how best to set up the clinics and get them started, fixed problems in the office, met local doctors, read electrocardiograms, wrote articles for the local

medical licenses were pending (AR_09086).

29

newspaper, gave lectures, participated in health fairs, interviewed personnel, and set up the billing system (AR_07873, 07880, 07886, 07896, 07902, 07905, 07911, 07912-13, 07916). Indeed, there were many instances where the doctors were fully credentialed, yet Dr. Kutty had no work for them (AR_007873, 07876, 07878, 07884, 07886, 07890, 07891, 07907, 07915-16).[30]

4.  The agency properly ordered that Dr. Kutty reimburse the H-1B doctors for their payment of his business expenses.

Dr. Kutty also contends that the Secretary erred in holding him liable for the expenses incurred by the doctors to obtain J-1 waivers and H-B1 visas.  (Pet. Br. pp. 28-29.)  As noted below, however, these employer-business expenses were imposed on the doctors, and reduced their wages below the required wage rate, in violation of the regulations.  Specifically, the regulations state that in order to satisfy the required wage obligation:

> [t]he required wage rate must be paid to the employee, cash in hand, free and clear, when due, except that deductions made in accordance with paragraph (c)(7) of this section may reduce the cash wage below the level of the required wage.

20 C.F.R. § 655.731(c)(1) (1995) (emphasis added).[31]

Paragraph (c)(7) of 20 C.F.R. § 655.731 allows the employer to take deductions that meet certain criteria, such as deductions required by law or a collective bargaining agreement. See 20

---

[30]  Dr. Kutty argues that it is "[i]nnately presupposed" within the statutory language that the H-B1 worker will possess the necessary skills of the position upon commencement of work; otherwise there will be disparate treatment of U.S. workers, which will allow less qualified foreign workers to be paid more. (Pet. Br. at 21, 25.)  To the contrary, the H-B1 provision's strict pay requirements provide an incentive to employers to hire licensed U.S. workers, rather than H-B1 workers.  See H.R. Rep. No. 106-692, at 12 (2000).  Indeed, nothing prevented Dr. Kutty from hiring U.S. workers to avoid application of the INA.

[31]  The deductions at issue were taken while the 1995 regulations were in effect. The amended regulation did not change this requirement.  See 20 C.F.R. § 655.731(c)(1) (2001).

C.F.R. §§ 655.731(c)(7)(i), (ii) (1995). However, deductions that are "a recoupment of the employer's business expense" are not permitted, if the deductions depress the employee's wages below the required wage, even if the matter is not shown in the employer's payroll records as a deduction. 20 C.F.R. §§ 655.731(c)(7)(ii), (iii)(C), (9) (1995); 20 C.F.R. § 655.731(c)(12) (2001). "Business expenses" include "attorney fees and other costs connected to the performance of H-1B program functions which are required to be performed by the employer, *e.g.*, preparation and filing of the LCA and H-1B petition." 20 C.F.R. §§ 655.731(c)(9)(ii), (iii)(C) (2001) (emphasis added).[32] An H-lB worker may be required to pay the expenses for counsel who is clearly providing legal advice personal to that worker; however, the employer may not pass its legal costs associated in any way with the LCA and petition on to the employee. 65 Fed. Reg. 80,199-80,200. Once an employer utilizes the services of an attorney for completing an LCA or H-1B petition, it has incurred an expense associated with the preparation of documents for which it has legal responsibility. Indeed, in an enforcement proceeding, the Department "will look behind any situation where it appears that an employee is absorbing an employer's business expenses." 65 Fed. Reg. 80,200.

       Contrary to Dr. Kutty's contentions, the preamble to the revised regulations confirms that

---

[32] The language in the revised (2001) regulations quoted above applies with equal force to the applicable 1995 regulations. As noted by the ALJ,

> this provision did not represent a change in DOL policy. Rather, in the Notice of Proposed Rule Making, it was included in an Appendix intended to explain DOL's interpretation of the previous regulation regarding employer business expenses, which was not open for notice and comment. In the final version of the rule, it was moved into the body of the regulations. 65 Fed. Reg. 80,198 (2000).

(AR_07924). See Orr v. Hawk, 156 F.3d 651, 654 (6th Cir. 1998) ("So long as a change in a regulation does not announce a new rule, but rather merely clarifies or codifies an existing policy, that regulation can apply retroactively.")

expenses related to filing the LCA and H-1B petition by the employer are business expenses even when the nonimmigrant is already in the United States:

> The Interim Final Rule continues to provide that any expenses directly related to the filing of the LCA and the H-1B petition are a business expense that may not be paid by the H-1B worker if such payment would reduce his or her wage below the required wage. These expenses are the responsibility of the employer <u>regardless of whether the INS filing is to bring an H-1B nonimmigrant into the United States, or to amend, change, or extend an H-B nonimmigrant's status</u>. As stated in the NPRM, the LCA application and H-1B petition, by law, may only be filed by the H-1B employer.

65 Fed. Reg. 80,199 (emphasis added).

Obtaining the waiver is integral to securing approval of the H-lB petition. The employer cannot file the petition unless the J-1 alien has the waiver. 8 U.S.C. §§ 1101 (a)(15)(H)(i)(b), 1182(e), 1184(l)(1) (B). (<u>See</u> AR_07925, 09090; <u>see also</u> 01736, 05121-24). Moreover, the employer plays a pivotal role in the employee's ability to obtain the waiver. To participate in the State 20 program, Dr. Kutty was required to meet specific guidelines and apply on behalf of the particular participant (AR_09090-91; <u>see</u> AR_01725, 01729, 01731, 02142, 03151, 03420-23, 03505-06, 05117-28, 05508, 05989). <u>See</u> 62 Fed. Reg. 28,801, 28,802-03 (1997).

There is no dispute that Dr. Kutty paid the H-lB doctors less than the required wage rates and that the doctors were required to pay expenses associated with obtaining J-1 waivers and filing H-1B petitions. Although Dr. Kutty contends that some fees were paid by the doctors to Health Impact, Dr. Kutty referred most of the doctors to that firm to complete the paperwork necessary for obtaining the J-1 waiver (AR_09090). One doctor testified that Dr. Kutty told him that he must use Health Impact because it is Dr. Kutty's business partner (AR_09090-91, 07870-71 n.15; <u>see</u> AR_06757-59). Another doctor testified that Dr. Kutty told him that his contract might be "revoked" if he did not use Health Impact's services for his J-l waiver (AR_06757-60).

32

Further, the attorneys hired by the doctors were not representing the doctors personally. Attorney Kalina Sarmov performed the H-lB work with respect to most of the doctors, either as Dr. Kutty's in-house counsel or "independently," often pursuant to Dr. Kutty's direction to the H-lB doctors[33] (e.g., AR_04693-95, 05067-81, 05325, 05386-94, 05398-99, 05513, 05843, 05986, 06376, 06565-66, 06619-20).[34]  In some cases, the doctors retained other counsel.  In all of these situations, the attorneys were simply performing the employer's required work -- doing what was necessary to file the LCAs and/or H-lB petitions  see, e.g., AR_02980-90 (private attorney performed the required LCA and H-lB petition work and sent detailed instructions to Dr. Kutty about where to sign and what he must do to comply with the law); AR_01963-64 (private attorney's invoice initially sent to Dr. Kutty); AR_02028-31 (private attorney billing for H-lB petition work)).  The ALJ specifically noted that where additional work personal to the doctors was provided at charge, i.e., not an actual business expense, she did not include it in the back wage calculations (AR_07925; see AR_09090).

5.  Dr. Kutty and the corporate entities retaliated against the H-lB doctors in violation of the INA.

The INA protects an employee who has disclosed information that he reasonably believes evidences a violation of the INA or regulations, or cooperates in an investigation concerning the employer's compliance with the requirements of the INA.  8 U.S.C. § 1182(n)(2)(C)(iv); see 20 C.F.R. § 655.801 (2001); 20 C.F.R. § 655.800(d) (1995).  This provision is similar to those in various other whistleblower protection statutes administered by DOL, and the same principles

---

[33] Dr. Kutty knew that Ms. Sarmov was charging the doctors a separate fee to perform the H-lB work, yet told them they needed to use her services (AR_01538).

[34] Dr. Casis wanted to employ his own attorney to negotiate a contract change, but Ms. Sarmov told him "Dr. Kutty wants his own lawyer to handle everything" (AR_05394).

33

apply.  See 65 Fed. Reg. 80,178.[35]  Hence, the Administrator was required to prove by a

preponderance of the evidence that the doctors engaged in protected activity, that Dr. Kutty knew

about the activity, and that he took adverse action against the doctors because of their protected

activity (AR_09091).  See Bartlik v. United States Dep't of Labor, 73 F.3d 100, 103 & n.6 (6th

Cir. 1996); Simon v. Simmons Food, Inc., 49 F.3d 386, 389 (8th Cir. 1995).  Dr. Kutty has not

challenged this standard.  (Pet. Br. at 30-35.)

　　　　The doctors engaged in protected activity by submitting a letter to Dr. Kutty demanding

that he pay the full salaries owed, and that if he did not do so within a week, they would notify

DOL (AR_09082, 09091-92, 07938-39; see AR_03303-04).  The record demonstrates that Dr.

Kutty clearly knew about the protected activity because he received the letter and, as a result of

receiving the letter, Dr. Kutty ceased paying any salaries to the doctors identified in the letter

(AR_09092).  At the administrative hearing, Dr. Kutty admitted that he stopped paying salaries

to the doctors because they sent the February 14, 2001 demand letter (AR_07165).  Further, Dr.

Kutty made payments to doctors who did not complain (AR_06602-03; AR_01779, 01786,

02110, 03543-47).

　　　　Dr. Kutty contends that the doctors were not paid because they were not working 40

hours per week in the clinics, they were moonlighting, and they failed to generate income

because they weren't credentialed.  (Pet. Br. at 30-31.)  However, the ALJ found that the doctors

were not underperforming, and that they consistently worked 40 or more hours per week

_____

[35]  Precedent under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et
seq., and other discrimination statutes is also relevant.  See In re Overall v. Tennessee Valley
Auth., ARB Nos. 98-111, 98-128, 2001 WL 487725, at *12 (Apr. 30, 2001), aff'd, 59 F. App'x
732 (6th Cir. 2003); (AR_07936-37).

34

(AR_07926-27, 07940).[36]  The ALJ also found "overwhelming evidence" that Dr. Kutty

specifically directed the doctors to work in emergency rooms, hospitals, and nursing homes

(AR_07925-26).  As admitted by Dr. Kutty, the doctors' employment agreements stated that

hospital rounds would count toward their 40 hour work week requirement, and Dr. Kutty

contracted for his doctors to work at hospitals (AR_09092, 07926 n.31; see AR_01603-04,

02200).  Payments for those services were made to the clinics and not the doctors (AR_09092,

07869; see AR_01838-46, 03489-03500).  Indeed, the doctors' emergency room work helped to

build up the practices (AR_07880-84, 07887, 07890-91, 07896-97, 07899, 07901-03, 07905,

07926-29, 09092; see also AR_01603-04, 04250).  Further, the doctors worked diligently to

establish the clinics, often starting with no patients, and building up a significant caseload.  They

engaged in many activities to promote the clinics, such as starting a continuing medical

education program, attending health fairs, providing consultations at hospitals, and giving

lectures.  They were very attentive to their patients (see AR_06433, 07871, 07880-86, 07890-91,

07896-99, 07901-03, 07916).[37]

_____

[36]  The number of hours that an H-1B nonimmigrant employee works is irrelevant to the INA's
wage payment requirements (AR_09092, 07926).  20 C.F.R. §§ 655.731(c)(4)-(5) (2001); 20
C.F.R. §§ 655.731(c)(3)-(4) (1995); 65 Fed. Reg. at 80,195 (employer not required to keep hourly
wage records for its full-time H-1B employees paid on a salary basis).

[37]  Dr. Kutty also claimed that he relied, in part, on the opinion of Hooli in reaching the
conclusion that the eight doctors were not working the required 40 hours per week (AR_01592-
01593).  But Mr. Hooli testified that he could not say how much time the doctors worked at the
clinics (AR_09092, 07866, 07926-27; see AR_07114-16).  Further, two of the physicians
testified that Hooli told them that "if this thing goes to the court that he will have to lie for his
friend . . . Dr. Kutty." (AR_09092, 05612, 06679-80; 07894, 07904, 07927).  Hooli also
delivered a termination letter from Dr. Kutty to one of the clinic office managers for "covering
up for the doctors," and then offered the manager reinstatement with a raise by if she would write
a letter stating that the doctors were not in the office to see patients. The office manager refused
to do so because it was not true. (AR_09092-93, 07897, 07927; see AR_05692-94, 05960-61,

35

Importantly, the doctors were fully licensed and credentialed at the time that Dr. Kutty retaliated, and Dr. Kutty sent the doctors written reprimands only <u>after</u> receiving Divine's letter (AR_09093, 07803, 07927-28). Reprimands were sent only to doctors identified in Divine's letter (AR_07927). Many doctors testified that prior to the Divine letter, Dr. Kutty had never even said anything critical of their work (AR_01590-92, 07880-81, 07887, 07893-94, 07898; <u>see</u> AR_05904-06, 06019, 06080, 06140-44, 06337-38, 06683-84). In fact, Dr. Kutty raised Drs. Ilie's and Ionescu's rate of pay to $80,000 per year in July 2000, and admitted that Dr. Speil met his obligations to the clinic (AR_07881, 07885, 07897; <u>see</u> 01398, 01402, 06017-19, 06140-44).

With respect to the second act of discrimination, the Administrator proved that the doctors engaged in two protected activities: first, attorney Divine filed a complaint with DOL on February 28, 2001, on behalf of the complaining doctors who had stopped receiving any salary; and second, the doctors gave interviews to Wage-Hour (AR_09093; <u>see</u> 03165-75, 03176-03232, 04465-66). <u>See</u> 8 U.S.C. § 1182(n)(2)(C)(iv); 20 C.F.R. §§ 655.801, 655.806. On March 19, 2001, DOL faxed Dr. Kutty a letter notifying him that an on-site investigation would commence at Dr. Kutty's Florida office on March 21, 2001 (AR_09093; <u>see</u> 03548-49). <u>See</u> 20 C.F.R. 655.805. Accordingly, on March 21, DOL began an on-site investigation at Dr. Kutty's Florida office. On that same day, Divine faxed a letter to Dr. Kutty demanding payment of salary amounts owed to two additional doctors, and amended the DOL complaint to include their names (AR_07916; <u>see</u> AR_03306-07). Later in the day, Dr. Kutty fired seven doctors represented by Divine. Dr. Kutty retained the three doctors not represented by Divine, as well as the two doctors whom he characterized to be the worst offenders with regard to working 40 hours

06332-33).

(AR_07939, 09093).

The record amply demonstrates that Dr. Kutty was aware that the doctors had filed a DOL complaint and that DOL had begun an investigation (AR_07939-41, 09093-94). For example, the February 14th demand letter to Dr. Kutty states that DOL will be notified if wages are not paid within a week (AR_09091-92; see AR_03303-04). Moreover, the ARB found that a patient of one of the doctors testified that Hooli told her that the doctors had "turned [Kutty] into the labor board" (AR_09093; see 06439-40).

Dr. Kutty argues that he terminated the doctors because the clinics were having financial problems, and because the Wage and Hour investigator told him that he could either pay the doctors the required wage rate or terminate them. (Pet. Br. at 31.) Further, Dr. Kutty contends that the terminations were justified because "for some period of time" the doctors were not qualified to practice medicine in Tennessee. Id. However, the ALJ credited the investigator's testimony that she did not recommend that Dr. Kutty fire the doctors, and the Board properly affirmed this finding (AR_07917-18, 07940-41, 09094; see AR_06471-72).[38] Additionally, Dr. Kutty terminated the physicians after they obtained their Tennessee licenses and other credentials. Thus, the Board properly affirmed the ALJ's finding that Dr. Kutty's decision to discharge the doctors was "inextricably linked to their having complained to Dr. Kutty and the DOL about the failure to pay them the salary required by the INA," and further, that Dr. Kutty could not prevail under a "dual motive" analysis because he did not show that he would have

---

[38] The ALJ's credibility determination is accorded "[g]reat deference." Taylor Steel, Inc. v. Keeton, 417 F.3d 598, 604 (6th Cir. 2005). The ALJ also evaluated Dr. Kutty's contention as if he had misunderstood the investigator, and she nonetheless concluded that the termination decision was retaliatory (AR_07939-41).

fired the doctors for financial reasons, even if they had not complained or participated in the

investigation (AR_07941, 09094).  See American Nuclear, 134 F.3d at 1295 ("If an employer

retaliates for both legitimate and illegitimate reasons, courts apply the 'dual motive' test, under

which the employer must show that it would have retaliated even if the protected activity had not

occurred.  The employer bears the risk if the two motives prove inseparable.") (citations

omitted); Simon, 49 F.3d at 389 (same); Pogue v. United States Dep't of Labor, 940 F.2d 1287,

1289-91 (9th Cir. 1991) (same).[39]

6.   The corporate veil was properly pierced, and therefore Dr. Kutty is personally liable for the violations.

     Under the INA H-1B provisions, the entity which files the LCA and the H-1B petition is

generally the liable party.  See Administrator, Wage & Hour Div., United States Dep't of Labor v.

Native Techs., Inc., ARB No. 98-034, 1999 WL 377285, at *6-7 (May 28, 1999).[40]  However,

the various corporations listed on the LCAs served merely as a front for Dr. Kutty and should not

serve to shield him from liability.

     A corporate entity will not be recognized to limit liability when to do so "would work

fraud or injustice."  See Taylor v. Standard Gas & Elec. Co., 306 U.S. § 307, 322 (1939); see also

Federal Deposit Ins. Corp. v. Allen, 584 F. Supp. 386, 397 (E.D. Tenn. 1984).  The Supreme

---

[39]  Dr. Kutty also contends that his position was "unfairly undermined by the ARB's admission
and undue reliance on evidence obtained through his prior deposition rather than taking live
testimony at the hearing."  (Pet. Br. at 30.)  Dr. Kutty then contradicts himself by providing a
litany of topics that he did testify about at the hearing.  (Pet. Br. at 30-31.)  In any event, this
objection is waived because it was not raised before the ARB.  See, infra.

[40] In addition to Dr. Kutty, the Administrator named as respondents those entities listed on the
LCAs: Center for Internal Medicine and Pediatrics, Inc., Center for Internal Medicine, Center for
Internal Medicine and Pediatrics, P.C., Center for Internal Medicine and Pediatrics, Sumeru
Health Care Group, Inc., Sumeru Health Care Group, Sumeru Health Care Group d/b/a Center
for Internal Medicine and Pediatrics (AR_07946-50, 07951 n.40; see AR_03233-03301).

Court has stated that "an obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking," is as an important factor in denying corporate stockholders a limited liability defense. Anderson v. Abbott, 321 U.S. 349, 362 (1944). Deference to the corporate form is less warranted when legislative policies are at issue. See Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc., 872 F.2d 702, 705 (6th Cir. 1988).

The agency correctly applied state law in making the determination whether to pierce the corporate veil (AR_07952-54, 09095-97).[41] Under Tennessee law, the determination of whether to pierce the corporate veil is "largely a factual one," and "particularly within the province of the trial court." Boles v. National Dev. Co., 175 S.W.3d 226, 244 (Tenn. Ct. App. 2005). Discarding the corporate entity is appropriate "when the corporation is liable for a debt but is without funds to pay the debt, and the lack of funds is due to some misconduct on the part of the officers and directors." Id.; accord VP Bldgs., Inc. v. Polygon Group, Inc., No. M2001-00613, 2002 WL 15634, at *4 (Tenn. Ct. App. 2002); Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc., 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995).[42] Further, Tennessee courts will pierce the

---

[41] The Sixth Circuit has applied state law in determining whether to pierce the corporate veil in the enforcement of federal statutes. See Carter-Jones Lumber Co. v. LTV Steel Co., 237 F.3d 745, 746 n.1 (6th Cir. 2001) (Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA")); Longhi v. Animal & Plant Health Inspection Serv., 165 F.3d 1057, 1061 (6th Cir. 1999) (Animal Welfare Act); United States v. Cordova Chem. Co., 113 F. 3d 572, 580 (6th Cir. 1997) (en banc) (CERCLA), vacated on other grounds sub nom. United States v. Bestfoods, 524 U.S. 51 (1998); United States v. WRW Corp., 986 F.2d 138, 143 (6th Cir. 1993) (Federal Mine Safety and Health Act). If federal common law were to apply, piercing would also be appropriate in this case, because "the rule in federal cases is founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity, and as federal common law generally gives less respect to the corporate form than does the strict common law alter ego doctrine." Carter-Jones Lumber, 237 F.3d at 746 n.1 (internal quotation marks and citations omitted).

[42] Thus, Dr. Kutty wrongly contends that whether the "physicians had someone to go after for

39

corporate veil "upon a showing that the corporation is a sham or dummy or such action is necessary to accomplish justice." Boles, 175 S.W.3d at 245; accord Muroll Gesellschaft, 908 S.W.2d at 213. Additionally, "when a corporation is dominated by an individual or individuals not only as to finance but also as to policy and business practices so that the corporation has no mind, will, or existence of its own and this domination is used to commit a wrong, or fraud or perpetrate a violation of statutory or positive legal duty, the corporate veil will be pierced."

Allen, 584 F. Supp. at 397-98; see Polygon, 2002 WL 15634, at *6. Some factors considered by Tennessee courts in determining whether to pierce the corporate veil are:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

Boles, 175 S.W.3d at 245-46 (quoting Allen, 584 F. Supp. at 397).[43] As explained by the Tennessee Court of Appeals, "[i]t is most important to note that it is not necessary that all of the Allen factors weigh in a plaintiff's favor in order to justify the piercing of the corporate veil." Boles, 175 S.W.3d at 246.[44]

---

past due compensation" is not an element in deciding whether to pierce the corporate veil. (Pet. Br. at 39-40.)

[43] In Allen, corporate officers were found personally liable for corporate indebtedness where a loan was part of a three-year course of fraudulent conduct involving circumventing federal banking laws and regulations pertaining to insider loans. 584 F. Supp. at 397-98.

[44] Thus Dr. Kutty errs by arguing that the party seeking to pierce the corporate veil is required to

40

The ALJ initially observed that "[t]he record discloses a confusing web of corporations owned and operated by Dr. Kutty with some connection to the H-lB workers in this case" (AR_07947). Indeed, at least a dozen variations of "Sumeru Health Care Group" and "Center for Internal Medicine and Pediatrics" appear on the H-lB petitions, LCAs, employment agreements, paychecks and W-2s (AR_07947-50). At deposition, Dr. Kutty agreed that he asked his attorney to "just set me up some companies to run some clinics in Tennessee," and that he owned 100% of all of the entities (AR_01425, 07947).[45]

The ALJ stated that "various documents signed by Dr. Kutty have confused the issue of which corporate entities were acting as the H-lB doctors' employers." (AR_07951-52). For example, "Sumeru Health Care Group, Inc.," which was the corporate entity identified on the LCAs and H-1B petitions for Drs. Ilie and Ionescu, as well as on the LCA for Dr. Venkatesh, issued paychecks for 15 of the 17 doctors, before <u>and after</u> it was dissolved (AR_07948, 07950; <u>see</u> AR_01617-21, 01933-43, 02000-08). "Sumeru Health Care Group, L.C. doing business as the Center for Internal Medicine and Pediatrics, Inc." was listed as the employer in employment agreements with eight of the doctors (AR_07951). The Center for Internal Medicine and Pediatrics, "Inc." or "P.C.," issued W-2s for at least 12 of the 17 doctors, and were identified as employers on ten H-lB petitions (AR_07952). <u>See also</u> (AR_07947-50 – Chart). Indeed, as noted by the ALJ, "[t]he assets of the various corporations were interchangeable, and dealings were not at arms' length" (AR_07954). Little respect was given to the corporations' separate

"show all factors" listed in <u>Allen.</u> (Pet. Br. at 38.)

[45] Dr. Kutty's wife had no ownership interest, except that some of the Florida clinics were owned jointly by Doctor and Mrs. Kutty as tenants in the entirety (AR_07947; <u>see</u> AR_01425-27, 01508).

41

identities.[46]

The ALJ specifically concluded that "Dr. Kutty had sole control over the corporate entities who submitted the LCAs and nominally employed the doctors, as well as some or all of the Florida companies in which he was involved." (AR_07954; see AR_07176). In fact, Dr. Kutty testified that "Sumeru Healthcare Group, LLC is just me. Maya Healthcare is just me. Sumeru, Inc. is just me. And Center for Internal Medicine and Pediatrics in Maynardsville is just me" (AR_01426, 07236-37). He explained that he was president of the Tennessee companies, that the Tennessee clinics are owned by entities that are ultimately owned completely by him, that he is the only "member" of these entities, and that he doesn't have to report to anyone else in relation to these entities (AR_01427, 01464-65, 07148, 07954). Although Mrs. Kutty was listed as a director in some corporate records, Dr. Kutty testified that he made all the decisions for the corporate entities (AR_07954; see AR_01414-16, 07236-37).

The corporate form was also ignored. Despite the fact that Dr. Kutty was the sole owner of the companies, he largely denied any specific knowledge of how the businesses were organized and interacted, or the formalities of corporate governance (AR_07947; see AR_01464-66, 07149). There is no evidence that stock certificates were issued for any of the corporations, nor did Dr. Kutty know whether the corporations had a board of directors, or if financial statements were ever issued (AR_07954; see AR_01464-65). Indeed, no internal corporate records such as minutes or financial records were produced (AR_07869, 07950). There were no

---

[46] Dr. Kutty's office and the corporate offices were located in the same facility in Hudson, Florida (AR_07954; see AR_01372). Dr. Kutty's in-house lawyer, Ms. Sarmov, performed the legal work for all the entities (AR_01446). The Florida office handled administration for all of the Florida and Tennessee operations (AR_01441). Billing for the companies was centralized, and controlled by Dr. Kutty (AR_07954; see AR_01389). Some of the corporations even had the same tax ID number (AR_01560).

42

formal corporate meetings, other than meetings with Doctor and Mrs. Kutty, and Ms. Sarmov when she was there. Dr. Kutty was sure that Ms. Sarmov "used any day she wanted as the specific day that the board met" (AR_01466). He also testified that whenever there was a need to create a corporate legal document, he would just execute it on behalf of whichever company was involved (AR_01465). Dr. Kutty could not state how much money was used to start the clinics, or whether money was contributed as capital or loans, or if he contributed any amount of money as the sole shareholder in return for his ownership interest (AR_07868-69, 07954; see AR_01452, 01454, 01464).[47]

The ALJ also found that Dr. Kutty "freely treated and shared personal and corporate assets as his own" (AR_07954). He could not state what his income has been in recent years and he does not read his tax returns (AR_07954). Dr. Kutty stated that he was supposed to be paid $100,000 per year, but that he has not received a salary for the past two to three years. Id.[48] Instead, he has received about $50,000 per year in pay-backs for loans he has made to his Florida companies.[49] His wife earned an annual salary of $50,000 (AR_07954; see AR_01459-60). Dr. Kutty has no personal assets, except for his house which he jointly owns with his wife (AR_07954; see AR_01506). He has no savings accounts, checking accounts, credit cards, stock

---

[47] In deciding whether to pierce the corporate veil, Tennessee courts consider a lack of evidence regarding the corporations' financial activities to be of significance. See Polygon, 2002 WL 15634, at *7 ("we, like the trial court, are impressed by the lack of evidence regarding the corporation's financial activities"); Muroll Gesellschaft, 908 S.W.2d at 214 ("This record is impressive -- not from the facts revealed therein, but from the lack of facts revealed.").

[48] At one point, Dr. Kutty stated that he is supposed to be paid $100,000 biweekly (AR_01453).

[49] Dr. Kutty also testified that when the Florida companies repaid his loans, he "directed them to the Tennessee operation" (AR_01454, 07868; see also AR_01382).

43

portfolio, or foreign assets (AR_01506-10).  His wife gets cash from one of the company offices to give to him (AR_07954; <u>see</u> AR_01510).  One of the corporate entities owns his Lexus automobile and cellular phone (AR_01506-07, 01509).

The corporations were undercapitalized and operated at a loss (AR_07954).  Dr. Kutty established the corporations with the idea that they would not generate sufficient income to properly pay the doctors for three to five years (AR_07944; <u>see</u> AR_01385, 01434-35, 01526-29, 01578-84).  He knowingly paid the doctors "half the rate" (AR_07159-60, 05842).[50]  He testified that the "finances [were] not there in the company." (AR_01439).  He could not say how much money was used to start the clinics (AR_07954; <u>see</u> AR_01452).  The Tennessee corporation, Sumeru Health Care Group, Inc., was dissolved in September 2000, while the doctors were still employed (AR_07950; <u>see</u> AR_01617).  By the time of the hearing, none of the Tennessee corporations were operating (AR_07152).  The ALJ concluded that:

> Dr. Kutty never intended to pay the H-1B doctors the required wages, and willfully violated that and other requirements of the INA.  The companies which submitted the LCAs in this case have gone out of business in Tennessee and, it appears, may have no assets to pay either the back wages or the civil money penalties.  To the extent that the Tennessee clinics could have continued to operate and generate income and salaries based on the doctors' work, that possibility was foreclosed by Dr. Kutty's illegal action of terminating the doctors in retaliation for engaging in protected activity.  The corporate entities were a sham, and piercing the veil is necessary to do justice for the H-1B employees.  Like the corporations in the <u>Federal Deposit Ins. Corp.</u> case above, Dr. Kutty's corporations had no mind, will, or existence of the their own, and his domination was used to perpetuate violations of statutory duties.  Like the corporate officers held personally liable for a three-year course of fraudulent conduct under federal banking laws, Dr. Kutty should be personally liable to pay the back wages and civil money penalties due for his three-year course of fraudulent activity under the INA.

---

[50]  Dr. Kutty had received specific written advice from attorneys about the INA requirements, and ignored it (AR_07944; <u>see</u> AR_02948, 02980-90, 03463-67).

(AR_07954; see AR_09097).  The ALJ further concluded that Dr. Kutty formed the undercapitalized corporations contemporaneously with hiring the doctors under the H -1B program, while intending to underpay them, and in-fact underpaying them, in violation of the INA (AR_07863, 07954).  Dr. Kutty's actions defeated the legislative policies that underlie the INA, by driving down U.S. workers' wages.  Additionally, it is against the national interest to use the INA to knowingly employ aliens illegally.  Should Dr. Kutty not be held personally liable, he can start the whole process over again by filing new H-lB petitions.  On the other hand, if the veil is pierced, Dr. Kutty will be debarred from the H-lB program for at least two years (AR_07954).  See 8 U.S.C. § 1182 (n)(2)(C)(ii).[51]

Dr. Kutty argues that he cannot be held personally liable because the INA does not impose personal liability.  (Pet. Br. at 35-37.)  However, the Supreme Court has explained that piercing the corporate veil is a common-law principle that applies to the enforcement of federal statutes, unless the statute expressly states otherwise.  United States v. Bestfoods, 524 U.S. 51, 62-63 (1998).  Accord Carter-Jones Lumber Co. v. Dixie Distrib. Co., 166 F.3d 840, 847 (6th Cir. 1999).[52]

---

[51]  If the corporate veil is pierced, Dr. Kutty clearly is the employer responsible for the violations (AR_09097-98).  The ALJ found that Dr. Kutty is the employer under the regulations (AR_07954-56), and this finding was not appealed before the ARB (AR_08136-55, 08375-08407).  Dr. Kutty hired each doctor, decided how much they would be paid, withheld their salaries, and terminated them (AR_01399, 01405, 01410-11, 01414-16, 01430, 01524-25, 01561, 07164-65, 07236-37).  He signed the employment contracts as well as the paperwork for the Department of Labor, consular office, and the INS (AR_07955; see AR_01539).

[52]  Dr. Kutty's citation to Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987), which does not involve the issue of piercing the corporate veil, is inapposite.  (Pet. Br. at 37.)

45

Indeed, the Sixth Circuit has repeatedly found the common-law principle of piercing the corporate veil applicable to the enforcement of federal statutes.  See Flynn v. Greg Anthony Constr. Co., 95 F. App'x 726, 733-34 (6th Cir. 2003) (Employee Retirement Income Security Act); Longhi, 165 F.3d at 1061 (Animal Welfare Act); WRW, 986 F.2d at 143 (Federal Mine Safety and Health Act); United States v. Walton, 909 F.2d 915, 927-28 (6th Cir. 1990) (Internal Revenue Code); Service, Hosp., Nursing Home & Pub. Employees Union v. Commercial Prop. Servs., Inc., 755 F.2d 499, 504 (6th Cir. 1985) (Labor Management Relations Act).

Dr. Kutty contends that "as a matter of law" the corporate veil cannot be pierced because the companies are professional medical corporations which must be owned by a medical provider under Tenn. Code Ann. § 48-101-601, et seq.  (Pet. Br. at 39.)  However, there is no authority for exempting owners of professional corporations from individual liability when piercing the corporate veil is appropriate, and many of the corporations in this case were not professional corporations under the Tennessee Code.  Compare Tenn Code Ann. § 48-101-609(a)(1), (a)(2)(name of a professional corporation must contain the words "professional corporation," "professional association," or "service corporation" or the abbreviation "P.C.," "P.A.," or "S.C.", and may not contain language indicating that it was incorporated for any purpose other than a professional corporation) with AR_07946-50, AR_01618, 07150.

Dr. Kutty contends that he should be exonerated because "the record is devoid of any allegation of diversion of corporate funds for personal use."  (Pet. Br. at 39.)  However, in WRW, 986 F.2d at 143, the Sixth Circuit found that the fact that there was no evidence that the individual defendants siphoned off corporate funds, and the fact that the corporation never distributed dividends to the individual defendants, did not mitigate against piercing the corporate

46

veil because, similar to the instant case, the corporation was never sufficiently capitalized, and

operated at a loss during its two years of active existence.  See Carter-Jones Lumber, 237 F.3d at

749 (where sole shareholder of corporation causes corporation to commit an illegal act, there is

no immunity from piercing the corporate veil even if shareholder observed all corporate

formalities and never commingled funds); Polygon, 2002 WL 15634, at *6 (piercing the

corporate veil appropriate where sole shareholder-director-officer of undercapitalized

corporation exercised complete dominion and control over all corporate decisions and actions,

and made personal loans to the corporation out of her personal funds).

        Dr. Kutty also contends that he operated the clinics as one enterprise because he was

attempting to comply with the Stark II laws.  (Pet. Br. at 40-41.)[53]  The Stark law prohibits a

physician from referring Medicare patients for certain "designated health services" (DHS) to an

entity with which the physician has a financial relationship, unless an exception applies.  42

U.S.C. § 1395nn(a).[54]  Under the in-office ancillary services exception, physicians may refer

patients for DHS to their own group practices.  42 U.S.C. § 1395nn(b)(2); 42 C.F.R. §

411.355(b).  For purposes of the in-office ancillary services exception only, a "group practice"

must, among other things, be a single legal entity of two or more physicians that operates as a

"unified business" with centralized decision-making and consolidated billing, accounting, and

financial reporting.  42 C.F.R. § 411.352(a), (f).  It does not include "separate group practices

under common ownership or control." 42 C.F.R. § 411.352(a).  Thus, Dr. Kutty's "enterprise"

---

[53]  Dr. Kutty did not make this argument before the ARB.

[54]  The prohibition is also applicable to certain referrals of Medicaid patients.  42 U.S.C.
1396b(s).

47

consisting of "different legal entities" cannot constitute a group practice under Stark. (Pet. Br. at 40-41.) Indeed, Dr. Kutty's basic ignorance of the Stark law belies his suggestion that he ever attempted to comply with it. Further, nothing in the Stark law provides immunity from piercing the corporate veil.

7. <u>The Administrative Law Judge afforded Dr. Kutty Due Process.</u>

Dr. Kutty contends that his procedural due process rights were violated in several respects. (Pet. Br. at 42-43.) However, not only did Dr. Kutty waive these issues by failing to raise them in a timely manner, Dr. Kutty or his counsel <u>agreed</u> to all but one of the procedures at issue.[55] <u>See</u> <u>Hix</u>, 824 F.2d at 527-28; <u>Newtown</u>, 819 F.2d at 678. Indeed, "[p]rocedural objections under the APA are precisely the sort of issues appropriately raised before the [agency] in the first instance." <u>Cellnet v. Federal Commc'ns Comm'n</u>, 149 F.3d 429, 442 (6th Cir. 1998) (internal quotation marks and citations omitted).[56]

Significantly, Dr. Kutty stated the following to the ALJ during his closing argument:

[55] Dr. Kutty did contend before the ARB that "the procedures followed in this case violated the rights of the Respondents." However, his argument regarding procedures focused solely upon the investigation initially conducted by the agency, and with the ALJ's refusal to hold DOL or INS responsible for the violations committed by Dr. Kutty in connections with the processing and approval of the LCAs and petitions (AR_08093, 08097-08100, 08376, 08379-81). Note that Dr. Kutty was represented by counsel before the ARB (<u>see</u> AR_09080, 08093-08115, 08375-08405; <u>see</u> n.19 <u>supra</u>).

[56] <u>See</u> <u>Coalition for Gov't Procurement v. Federal Prison Indus.</u>, 365 F.3d 435, 461-65 (6th Cir. 2004) (issue exhaustion, which precludes reviewing courts from considering arguments not raised before an administrative agency, applies if required by statute, regulation, or if the proceedings are sufficiently adversarial). The instant case involved an adversarial hearing pursuant to the Rules of Practice and Procedure before the Office of Administrative Law Judges, 29 C.F.R. Part 18, as well as an adversarial appeal before Administrative Review Board. As noted previously, the party seeking review before the Board is required to specify the issues to be appealed and state the specific reasons for appeal. 20 C.F.R. §§ 655.845(b)(3), (4).

48

I have been allowed, through counsel to cross-examine witnesses, present evidence and today make a closing argument. Before I comment on the evidence, I must thank American [*sic*], not only for the material things that I have enjoyed in this country, but more importantly, for due process that is an open trial, where I could freely and an impartial judge. And I would like to really like to thank you at this moment.

(AR_07225).

Dr. Kutty contends that the ALJ violated his procedural due process rights by failing to postpone the hearing when he was suddenly stricken with an emergency condition. (Pet Br. at 42 – 43.) However, at the administrative hearing, Dr. Kutty's counsel stated that Dr. Kutty and his corporate representative (Mr. Hooli) "did wish for the hearing to proceed without them, so we're going to go ahead" (AR_05196). Further, Dr. Kutty's argument, that he could not participate from June 18 through June 28, is simply not credible. (Pet. Br. at 43.) The medical records, submitted by Dr. Kutty as Addendum A, show that Dr. Kutty was treated for a kidney stone on June 8th and released from the hospital on June 9th. He was again treated on June 15th and released the same day. The August 17th hospital report explains that after the June 15th treatment, Dr. Kutty "went to India for vacation."[57]

Dr. Kutty argues that the ALJ improperly relied on his prior deposition and "the testimony of a subordinate employee who lacked relevant knowledge of the matter." (Pet. Br. at 42.) Dr. Kutty did not raise these issues when the hearing resumed in December 2001, nor did he raise these issues before the ARB (AR_06919-07241, 08136-55, 08375-08407).[58] Further, the deposition involved a related proceeding filed in state court by ten of the subject doctors against

---

[57] Neither Dr. Kutty nor Hooli attended the hearing on June 7th, prior to the medical emergency at issue (AR_05196).

[58] Dr. Kutty did object to the admission of the deposition earlier in the trial proceeding (AR_04417, 07668 (dated June 4, 2001)).

49

Dr. Kutty and six of the corporations (AR_07864 n.11; see AR_00586 & n.1).  In that case, the

doctors obtained an injunction restraining Dr. Kutty and the corporations from enforcing the

$350,000 employment-contract penalty clauses.  Indeed, the INA prohibits imposition of a

penalty if the H-1B worker ceases employment before an agreed date.  8 U.S.C. §

1182(n)(2)(C)(vi)(I).  Further, Dr. Kutty provided sworn testimony at the deposition, and he was

represented by W. Tyler Chastain, Esq., the attorney providing representation in this case

(AR_01369-01616).  Moreover, at the administrative hearing, Dr. Kutty's counsel agreed that

there should not be duplicative efforts regarding deposing Dr. Kutty (AR_04306).

With respect to the claim that the ALJ relied on the testimony of a "subordinate

employee," Dr. Kutty does not identify the "subordinate employee" in his brief.  Presumably, Dr.

Kutty is referring to his corporate administrator Hooli, who was actively involved in the

operation of the clinics, and relied upon by Dr. Kutty to a great extent (AR_07857,07866-67,

07869-70, 07872, 07874-75, 07881, 07884-85, 07887, 07891-92, 07894, 07897-98, 07900,

07903-04, 07913-18, 07926-27, 07938-39; see AR_01593).  Moreover, Dr. Kutty designated

Hooli as the corporate representative for the administrative hearing, and allowed Hooli to

question witnesses on behalf of the corporation, as well as testify on behalf of the corporations

(AR_06921, 06925-26, 07063, 07105, 07107-46).

Dr. Kutty further contends that the judge erred by "imposing personal liability in Dr.

Kutty's absence at the hearing for perceived corporate violations which only he could fully

explain and defend."  (Pet. Br. at 42.)  To the contrary, Dr. Kutty appeared at the beginning of

the June hearings and during the December hearings.  Dr. Kutty testified and made a closing

argument (AR_06921, 06925, 07104-05, 07107, 07148-07240).  Notably, the record is clear that

50

he elected for the June hearings to proceed in his absence (AR_05196).

Dr. Kutty also contends, for the first time, that the ALJ violated due process by permitting a corporate officer to represent the medical clinics, which is not permitted under Tennessee law, and that his counsel withdrew because he could not participate during most of the June hearing dates.  (Pet. Br. at 43.)  However, Dr. Kutty's appearance without counsel was entirely his own doing --- he had not paid counsel, he was uncooperative with counsel, he left the country --- causing counsel to seek withdrawal in mid-October (AR_01343-45).  The ALJ did not resume the hearing until December 4th, yet Dr. Kutty did not obtain new counsel in time for the trial.  Further, Dr. Kutty had notice since June 28, 2001, that the hearing would resume from November 26, to December 7, 2001 (AR_01345).  Any further delays would have been extremely prejudicial to the Administrator, particularly because it was unclear that Dr. Kutty would retain new counsel if given additional time (AR_01344-45).

Prior to resuming the hearing, the ALJ twice asked Dr. Kutty if would like to seek legal representation, and he declined (AR_06928-29).  Rather than defaulting the corporations, she allowed the case to proceed (AR_01343-45;).[59]  Indeed,  Dr. Kutty's suggestion that he was denied due process by being allowed to represent the corporation himself is misguided, as demonstrated in Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 1427 (7th Cir. 1985), cert. denied, 475 U.S. 1147 (1986), a case with remarkably similar facts.  Euroquilt, Inc. had been represented by counsel at pretrial proceedings, but was not represented at trial, because counsel had withdrawn for not being paid.  The court gave Euroquilt a month to obtain new counsel, and declined to postpone the trial further.  Euroquilt did not obtain new counsel and was

---

[59]  As noted earlier, a corporation need not be represented by counsel in ALJ proceedings. 29 C.F.R. § 18.34(g)(3).

51

represented at trial by its president. After trial, Euroquilt obtained new counsel, who filed a motion for a new trial on the ground that a layman may not represent a corporation. The Seventh Circuit affirmed the district court's ruling against Euroquilt:

> If [the plaintiff] had objected to [the president's] representation of Euroquilt, the district court would have been required to prevent Euroquilt from appearing at trial. The upshot of this would have been the entry of a default judgment for [the plaintiff], unless the district court was required to give Euroquilt more time to obtain counsel. But Euroquilt had had counsel before, and its decision to put its lawyers' bills at the bottom of the stack caused the problem of which it now complains. A corporation may not grant itself a continuance by manipulating things so that it has no counsel. The district judge would have been entitled to dismiss the case -- which she said she would have done -- rather than force [the plaintiff] to wait indefinitely for Euroquilt to retain counsel.

Id. See also Third Nat'l Bank in Nashville v. Celebrate Yourself Prods., Inc., 807 S.W.2d 704, 706-07 (Tenn. Ct. App. 1990) (holding that entering default judgment against indigent corporation was appropriate rather than permitting representation by individual owners). Indeed, Dr. Kutty's representation of the corporations is further evidence that they had no "mind, will, or existence of their own."[60]

In sum, Dr. Kutty's procedural arguments mirror his conduct regarding the merits of the case. He should not be permitted to agree to proceed, fail to obtain counsel, and then benefit from these activities.

## CONCLUSION

For the reasons stated above, the Secretary respectfully requests that the District Court affirm the ARB's Final Decision and Order in its entirety.

Respectfully submitted,

---

[60] Counsel did prepare Dr. Kutty's post trial brief, petition for review, and ARB brief (AR_07695-07726, 08136-55, 08375-08407).

52

JAMES R. DEDRICK
United States Attorney


By:    <u>s/ Loretta S. Harber</u>
LORETTA S. HARBER
Assistant United States Attorney
TN BPR #007221
800 Market St., Suite 211
Knoxville, TN 37902
(865) 545-4167


OF COUNSEL:

JONATHAN L. SNARE
Acting Solicitor of Labor

STEVEN J. MANDEL
Associate Solicitor

JONATHAN M. KRONHEIM
Counsel for Trial Litigation

CAROL B. FEINBERG
Senior Attorney
U.S. Department of Labor
200 Constitution Ave., N.W.
N 2716
Washington, P.C. 20210
(202) 693-5555

Counsel for the Secretary of Labor

53

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2007, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's electronic filing system.

<u>s/ Loretta S. Harber</u>
LORETTA S. HARBER
Assistant U.S Attorney

54