**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **MOHAN KUTTY, M.D.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:05-CV-510** |
| | ) | **(Phillips)** |
| **UNITED STATES DEP'T OF LABOR,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM AND ORDER**

On October 9, 2002, an Administrative Law Judge ("ALJ") found that Dr. Mohan Kutty ("Dr. Kutty") violated multiple provisions of the Immigration and Nationality Act ("INA"). Specifically, the ALJ held that Dr. Kutty, a medical doctor with five clinics in Tennessee, violated the INA's "no benching" and anti-discrimination provisions. 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n), and 1184©. The ALJ also assessed back wages totaling $1,044,940.00 and civil monetary penalties in the amount of $108,800.00. On May 31, 2005, the United States Department of Labor Administrative Review Board ("ARB") affirmed the ALJ's decision.

On February 16, 2007, Dr. Kutty filed a petition seeking review of the ARB's "Final Decision and Order." [Doc. 18]. On October 19, 2007, the Department of Labor ("DOL") filed its response. [Doc. 30]. On December 20, 2007, Dr. Kutty filed a supplemental brief in support of his petition. [Doc. 32]. On February 29, 2008, the DOL filed a supplemental response. [Doc. 35]. The matter is now ripe for adjudication, with the following issues before the Court:

■     First, did the American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA") (which amended the INA) apply to the medical clinics when they allegedly violated the "no benching" provision?

■　Second, was the ARB "arbitrary and capricious" in finding that the medical clinics violated the "no benching" and anti-discrimination provisions of the INA? In addition, did the approval of allegedly "defective" Labor Condition Applications ("LCAs") and H-1B petitions by the Department of Labor and the Immigration and Naturalization Services relieve Dr. Kutty and the medical clinics from having to comply with the INA?

■　Third, was the ARB "arbitrary and capricious" in deciding to pierce the corporate veil of the medical clinics, thereby holding Dr. Kutty personally liable for the INA violations?

■　Fourth, was the ARB reasonable in ordering Dr. Kutty to reimburse the H-1B doctors for the expenses incurred in filing the LCAs and H-1B petitions?

■　Fifth, was the ALJ's conduct during the administrative hearings procedurally arbitrary and capricious?

Having reviewed the Administrative Record ("AR"), the pleadings, and the relevant caselaw, Dr. Kutty's Petition for Review [Doc. 18] is **DISMISSED**. Accordingly, the ARB's ruling is **AFFIRMED**.

## I.　BACKGROUND

On October 9, 2002, the Honorable Alice M. Craft, Administrative Law Judge ("ALJ"), issued her "Decision and Order" in an action brought by the Department of Labor Administrator, Wage and Hour Division. [AR 07854-07964]. Specifically, the ALJ concluded that Dr. Kutty violated multiple provisions of the Immigration and Nationality Act ("INA"), including portions of 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n), and 1184©. Dr. Kutty then appealed that decision to the United States Department of Labor Administrative Review Board ("ARB"). On May 31, 2005, the ARB issued its "Final Decision and Order" ("Final Decision") upholding and affirming the ALJ's "Decision and Order." [AR 9080-9102].

As background, Dr. Kutty opened five health care clinics in rural areas of Tennessee between

-2-

1998 and 2000. [AR 09081]. He hired seventeen alien doctors[1], each of whom held a J1 non-immigrant visa ("J1 Visa"), to staff and operate the clinics. [AR 01424-01429]. The doctors' J1 Visas allowed them to enter the United States to receive graduate medical education and training, but the visas also required them to return to their home countries for two years before they could subsequently apply for an immigrant or nonimmigrant visa or permanent residence. [AR 09081]. However, it is possible to obtain a waiver of the two-year home resident requirement if an interested state agency requests waivers on their behalf. [AR 09081-09082]. The aliens must show that they have employment agreements to practice medicine for at least three years in an area designated as having a shortage of health care professionals by the Secretary of Health and Human Services. [AR 09082]. If the alien secures a J1 waiver, then he or she may obtain an H-1B visa. [AR 09082].

Each of the seventeen doctors obtained J1 waivers. [Id.]. Dr. Kutty, acting as the medical director of the various medical clinics, signed and filed the Labor Condition Applications ("LCAs") with the Department of Labor ("DOL"). [Id.]. The DOL then certified the LCAs. [Id.]. Dr. Kutty also signed and filed the H-1B Visa petitions on behalf of the doctors. [Id.]. The Immigration and Naturalization Service ("INS") approved the petitions, and issued H-1B visas for the seventeen doctors. [Id.].

Dr. Kutty operates his medical practice from Florida via the "Center for Internal Medicine, Inc." [AR 07864]. The Center for Internal Medicine is a Florida corporation that Dr. Kutty and his wife, Sheela Kutty, jointly own and operate as the sole officers and directors. [Id.]. Dr. Kutty handled the administration of all his operations (both in Florida and Tennessee) through the Florida

---

[1] The doctors included: Nazeen Ahmed, Ferdinand Casis, Alexandru Chicos, Srinivasa Chintalapudi, Ahsanul Haque, Ionut Ilie, Madalina Ionescu, Sivalingam Kanagasegar, Rafay Khan, Victor Manole, Dragos Munteanu, Shoaib Naseem, Maqbool Qadir, Vlad Radulescu, Rajesh Rohatgi, Christian Speil, and Vivek Venkatesh.

-3-

corporate office. [Id.]. All major decisions about staffing, salaries, billing disputes, and miscellaneous employee questions were decided by Dr. Kutty in Florida. [AR 07864, AR 06725-26].

In the latter part of 2000, Dr. Kutty's clinics encountered some financial difficulties. [AR 09082]. Shortly thereafter, in January 2001, Dr. Kutty began to reduce some of the doctors' salaries. [Id.]. In response, eight of the doctors hired attorney Robert Divine ("Mr. Divine"). [Id.]. In February 2001, Mr. Divine wrote to Dr. Kutty demanding payment of the past-due salary amounts for his clients. [Id.]. Mr. Divine also stated that he would notify the DOL of Dr. Kutty's noncompliance with the terms of the LCAs, in the event that Dr. Kutty did not pay. [Id.]. Mr. Divine also informed Dr. Kutty that he was prohibited from discriminating against the doctors for their complaints about the INA violations. [Id.].

After Dr. Kutty received the letter, he stopped paying the eight doctors represented by Mr. Divine (except for one partial payment). [AR 09082]. As a result, Mr. Divine filed a complaint with the DOL on behalf of his clients. [Id.]. The ALJ held hearings over the course of several days in June 2001. [AR 07856]. Dr. Kutty, however, required hospitalization on June 7, 2001. [DOL's Response in Opposition to Dr. Kutty's Petition, Doc. 30, at 16]. The hearings continued in Dr. Kutty's absence–at the direction of Dr. Kutty's personal attorney. [Id.]. While Dr. Kutty claims that he did not attend the hearings because he was ill all summer, counsel for the DOL states that Dr. Kutty went on vacation to India after his surgeries. [Id.]. Dr. Kutty did not attend the hearings on June 8, 18, 19, 20, 21, 22, 25, 26, 27, or 28th. [Id.]. During the hearings, the ALJ admitted the deposition testimony of Dr. Kutty from a prior related proceeding into evidence. [Id.].

The hearings were scheduled to resume on November 26, 2001. [AR 01343]. However, on

-4-

October 17, 2001, Dr. Kutty's counsel filed a motion requesting to withdraw as counsel because Dr. Kutty had not paid his legal bills and there was a breakdown in the attorney-client relationship. [AR 01343-45]. The ALJ granted the motion to withdraw and the hearings resumed in December 2001. [Id.]. Dr. Kutty elected to represent himself, and Basavaraj Hooli ("Mr. Hooli") was appointed as the "corporate representative." [Id.].

The hearings concluded on December 5, 2001, and the ALJ issued her "Decision and Order" on October 9, 2002. [AR 07854]. The ALJ found that the medical clinics violated the INA by willfully failing to pay the doctors their required wages and discriminating against nine of the doctors for engaging in a protected activity. [Id.]. The ALJ also decided to "pierce the corporate veil," thereby holding Dr. Kutty personally liable for the violations. [Id.]. As a result, Dr. Kutty was ordered to pay back wages and civil monetary penalties, and was barred from employing aliens from the H-1B program for two years. [Id.].

On May 31, 2005, the ARB affirmed the ALJ's decision in its "Final Decision and Order." [AR 09080]. Dr. Kutty now seeks review of the ARB's decision.

## II.  STANDARD OF REVIEW

This Court's jurisdiction arises under the Administrative Procedure Act ("APA"), pursuant to which this Court may generally review "final agency action." *See* 5. U.S.C. § 704 (2006). The review of a final agency action, however, is highly deferential, and requires "this Court to defer to the inferences that the DOL derives from the evidence." Ind. Mich. Power Co. v. U.S. Dep't of Labor, 278 F. App'x 597, 602 (6th Cir. 2008) (citing Varnadore v. Sec'y of Labor, 141 F.3d 625, 630 (6th Cir. 1998)). The Court may reverse the Secretary of Labor's decision, announced via the ARB, if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" or

if it is "unsupported by substantial evidence." 5 U.S.C. § 706(a)(2)(A), (E); *e.g.*, Sassé v. U.S. Dep't of Labor, 409 F.3d 773, 778 (6th Cir. 2005) (quoting Varnadore, 141 F.3d at 630).

The arbitrary and capricious standard "is the least demanding review of an administrative action." Coal. for Gov't Procurement v. Fed. Prison Indus., 365 F.3d 435, 475 (6th Cir. 2004). "It requires the party challenging the agency's action to 'show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations.'" Id. at 475 (quoting McDonald Welding v. Webb, 829 F.2d 593, 595 (6th Cir. 1987)). As the Supreme Court has stated, an agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Under the "arbitrary and capricious" standard, the scope of review is narrow. With regard to whether the Secretary's decision was supported by substantial evidence,

> the Board's decisions must be supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The substantial evidence standard is a lower standard than weight of the evidence and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

Sassé, 409 F.3d at 778 (inner citations and quotations omitted). In other words, "[s]ubstantial evidence is more than scintilla, but less than a preponderance, of the evidence. It is relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n, 166 F.3d 815, 818 (6th Cir.

1998).

When a "final agency action is challenged, the court's review is limited to the administrative record and the grounds for decision invoked by the agency." Stephens v. U.S. Dep't of Labor, 571 F. Supp. 186, 192 (D.D.C. 2008) (citing Camp v. Pitts, 411 U.S. 138, 142 (1983)). In addition, courts "will not normally disturb the credibility assessments of the [ARB] or an administrative law judge, 'who has observed the demeanor of the witnesses.'" Litton Microwave Cooking Prods. Div., Litton Sys., Inc. v. NLRB, 868 F.2d 854, 857 (6th Cir. 1999) (citing NLRB v. Baja's Place, 733 F.2d 416, 421 (6th Cir. 1984)).

## III.    ANALYSIS

### A.    The "No Benching" Provision of the ACWIA Applied During the Time of Dr. Kutty's Violations

Dr. Kutty argues that the "no benching" provision of the ACWIA should not have been applied for two reasons. First, Dr. Kutty argues that the "no benching" provision was enjoined by a federal district court in 1996. Nat'l Ass'n of Mfgs. v. U.S. Dep't of Labor, No. 95-0715, 1996 WL 420868 (D.D.C. Jul. 22, 1996). Second, Dr. Kutty argues that even if the "no benching" provision was not enjoined, the ARB applied the provision retroactively to his conduct. Neither argument has any merit. A brief history of the "no benching" provision makes this abundantly clear.

#### 1.    The District Court's Injunction Does Not Apply to the ACWIA

The H-1B visa program of the INA is a voluntary program that allows the temporary employment of "nonimmigrants" to fill "specialized" jobs in the United States. 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n). As part of the program, the employer must pay the nonimmigrant a "required wage." 8 U.S.C. § 1182(n)(1)(A); 20 C.F.R. §§ 655.715, 655.731(a)(1), (2). This means that the nonimmigrant is entitled to the higher of the actual wage (the wage paid by the employer

-7-

to individuals with the experience and qualifications similar to the nonimmigrant for the specific employment) or the prevailing wage (the locally prevailing wage for the occupation in which the nonimmigrant is to be employed.). Id.

When an employer seeks to hire a nonimmigrant in a "speciality occupation," the employer must first submit an LCA to the DOL. 8 U.S.C. § 1182(n)(1). A "speciality occupation" is one that requires the application of highly specialized knowledge, and a bachelor's degree or higher. 8 U.S.C. § 1184(i)(1). The DOL must certify the LCA within seven days unless it is incomplete or contains "obvious inaccuracies." 8 U.S.C. § 1182(n)(1). After the LCA is certified by the DOL, the employer must then submit a "H-1B petition" to the United States Citizenship and Immigration Services ("USCIS"). 8 U.S.C. § 1101(a)(15)(H)(i)(b). Along with this petition, the employer must submit a copy of the certified LCA. Id. Upon USCIS approval, the Department of State issues an H-1B visa to the nonimmigrant. C.F.R. § 655.705(b).

As part of the H-1B program, employers must pay the "required wages" for nonimmigrants within sixty days after the date the nonimmigrant becomes eligible to work for the employer, if the worker is already in the country on the date that the H-1B petition is approved. *See* 8 U.S.C. §§ 1182(n)(2)(C)(vii)(I), (II), (III). In addition, any periods of "nonproductive activity" must be compensated at the "required wage" rate. Id. This is referred to as the "no benching" provision. Specifically, an employer who places an H-1B employee "in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license" must pay the employee full-time wages for all nonproductive time. 8 U.S.C. § 1182(n)(2)(C)(vii)(I); 20 C.F.R. § 655.731(c)(7)(I). This provision does not apply if the "nonproductive time [is] due to non-work-related factors, such as the voluntary request of the

-8-

nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work. 8 U.S.C. § 1182(n)(2)(C)(vii)(IV). The INA also contains a "whistleblower" provision that protects H-1B employees who report INA violations, or cooperate in government investigations. 8 U.S.C. § 1182(n)(2)(C)(iv).

In 1996, the United States District Court for the District of Columbia enjoined the enforcement of various regulations promulgated by the DOL, relating to the H-1B visa program for nonimmigrants. Nat'l Ass'n of Mfgs, 1996 WL 420868 (hereafter, "NAM"). Notably, the court enjoined a "no benching" regulation that was promulgated by the DOL. 20 C.F.R. § 655.731(c)(4) & (5) (requiring payment to H-1B employees for certain "nonproductive" time and allowing the defendant to adjust the payment of part-time H-1B workers so that they are paid as fulltime employees"). Id., at *13. This regulation was similar to the "no benching" provision that eventually became part of the ACWIA (and therefore, the INA). Id. While the court found that the regulation was invalid, it was based upon procedural grounds. Id., at *25 ("The court finds that defendant [the DOL] issued these final rules without ensuring that affected parties were aware that such rules were contemplated. The court shall not exercise its equitable powers to allow the regulations to remain in place pending adequate notice and opportunity for comment."). Specifically, the court found that the regulation (which was "legislative" in nature, and therefore subject to the notice and comment requirement) was not promulgated pursuant to notice and comment rulemaking, as generally required by 5 U.S.C. § 706(2)(D). Id. Dr. Kutty argues that because the district court in NAM enjoined the "no benching" regulation, and because that court has not lifted the injunction, the "no benching" provision of the ACWIA should not apply to him. [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 15-16]. This is wrong on many levels.

-9-

In 1998, Congress amended the INA to include the "no benching" provision. Specifically, the INA was amended by ACWIA, Pub. L. No. 105-277, tit. IV, 112 Stat. 2681-641, 2681-643 to 2681-651. Because the "no benching" provision was made part of the statute, the "provision was immediately enforceable, regardless of whether the injunction pertaining to the regulation was dissolved." [DOL's Response in Opposition to Dr. Kutty's Brief, Doc. 30, at 23]. The injunction in NAM was directed to rulemaking promulgated by an executive agency. The injunction had absolutely nothing to do with Congress's authority to amend a statute. Even though Congress incorporated the substance of the DOL's regulation, that does not mean that the injunction applies. The rules and regulations in NAM were just that: rules and regulations. When the ARB applied the "no benching" provision to Dr. Kutty, it was not based upon invalid rules and regulations. It was based upon a statute.

Moreover, the court in NAM was not concerned with the actual substance of the "no benching" regulation. 1996 WL 420868 , at *13. The regulation was invalid based upon procedural grounds: the failure to comply with notice and comment rulemaking, 5 U.S.C. § 706(2)(D). Id., at *25. Congress was free to take the substance of the regulation and then incorporate it into a statute.

### 2.    The "No Benching" Provision Was Not Applied Retroactively

The "no benching" provision of the ACWIA became effective on October 21, 1998, which was the enactment date for the statute. Because Congress did not provide a specific effective date for Section 413 (the "no benching" provision), it became effective upon the general enactment date. *See* Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991) ("It is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment."). The issue, therefore, is whether Dr. Kutty's "conduct" occurred before the enactment of the statute. *See*

-10-

United States v. TRW, Inc., 4 F.3d 417, 423 (6th Cir. 1993) (recognizing that because the amendments of a federal statute were not made retroactive, "the provisions that govern are those that were in effect **at the time the conduct that is the subject of this litigation occurred**") (emphasis added); Millholland v. Summer Cnty. Bd. Of Educ., 569 F.3d 562, 566 (6th Cir. 2009) (recognizing that there is a "well-settled presumption against application of . . . new statutes that would have genuinely 'retroactive' effect," and therefore courts should generally apply the law that was in effect at the time of the relevant conduct) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 277 (1999)).

Dr. Kutty argues that his "conduct" occurred when he submitted the LCAs, not when he actually violated the INA. [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 15-17]. In contrast, the DOL argues that the "conduct" occurred when he actually violated the INA–that is, when Dr. Kutty refused to pay the H-1B doctors their required wages. [DOL's Response in Opposition to Dr. Kutty's Petition, Doc. 30, at 22]. The question is simple: what gave rise to this litigation? The relevant "conduct" has to be the violations–that is what started the whole proceeding. As long as the "no benching" violations occurred after October 21, 1998, then the ARB did not retroactively apply the "no benching" provision to Dr. Kutty's conduct. In this case, all of the "no benching" violations–failing to pay the H-1B employees the required wages–occurred after October 21, 1998. Therefore, the law was not applied retroactively in this case.

Finally, to the extent that Dr. Kutty argues that the ACWIA could not be implemented until final regulations were issued on December 20, 2000, that argument is also without merit. [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 16-17]. Regulations were not required to make the requirements of Section 413 enforceable. When Congress enacted the ACWIA, it

-11-

explicitly delayed implementation of certain sections until regulations were promulgated. For example, Section 412(a) of the ACWIA was made applicable to LCAs filed "on or after the date final regulations are issued to carry out such amendments." 112 Stat. At 2681-642 to 2681-643, 2681-645. In contrast, there was no restriction placed on the effective date of Section 413. Because Congress expressly provided rulemaking procedures for various sections of the ACWIA–but not Section 413–its intent was clear: Section 413 was complete at its enactment. Consequently, the "no benching" provision was final as of October 21, 1998–well before Dr. Kutty's violations.

**B.    The ARB Was Not "Arbitrary and Capricious" in Finding that the Medical Clinics Violated the "No Benching" and Anti-Discrimination Provisions of the INA**

**1.    Dr. Kutty is Estopped From Arguing that the LCAs and H-1B Petitions Were Invalid**

In the ARB's "Final Decision and Order," it found that the medical clinics violated the "no benching" provision in the INA, and also discriminated against nine of the doctors for engaging in a protected activity. Dr. Kutty argues that even if the INA was violated, the LCAs were allegedly defective, and therefore his conduct should be excused. [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 19-30]. Specifically, Dr. Kutty states that the LCAs (and therefore H-1B petitions) did not provide evidence of the doctors' abilities to practice medicine in Tennessee. [Id.]. In essence, Dr. Kutty–the person responsible for filing the LCAs and H-1B petitions–is trying to blame the DOL for a mistake that he actually made.

The Court agrees with the DOL that Dr. Kutty is estopped from making this argument. [DOL's Response in Opposition to Dr. Kutty's Petition, Doc. 30, at 37-38]. Under Tennessee law, "quasi-estoppel" (also referred to as "acquiescence") has been described as follows:

'Acquiescence' has been defined as a conduct from which may be

-12-

inferred an assent with a consequent estoppel or quasi-estoppel, and also has been described as a quasi-estoppel, or a form of estoppel. An acquiescence to a transaction is a person's tacit or passive acceptance, or an implied consent to an act. Generally, acquiescence as a defense has a dual nature in that, it may on the one hand, rest on the principle of ratification and be denominated an 'implied ratification,' or, on the other hand, rest on the principle of estoppel and be denominated as 'equitable estoppel.' **The doctrine arises where a person knows or ought to know that he or she is entitled to enforce his or her right to impeach a transaction and neglects to do so for such a time as would imply that he or she intended to waive or abandon his or her right.**

Crye-Leike, Inc. v. Carver, No. W2010-01601-COA-R3-CV, 2011 WL 2112768, at *11 (Tenn. Ct. App. May 26, 2011) (citations omitted) (emphasis added). As another court has stated, "[t]he doctrine of quasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects."

In re Kelley, 216 B.R. 806, 808 (Bankr. E.D. Tenn. 1998) (citation omitted). As the Court of Appeals for the Sixth Circuit ("Sixth Circuit") has explained:

> 'Quasi-estoppel' describes a situation in which an individual is not permitted to 'blow both hot and cold,' taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person actually relied thereon. The party seeking to invoke the doctrine has the burden of proving that the other party should be estopped.

PACE Indus. Union-Mgmt. Pension Fund v. Dannex Mfg. Co., Inc., 394 F. App'x 188, 199 (6th Cir. 2010) (citations omitted) (applying New Jersey law). *See also* Johnson v. Ga. Dep't of Human Res., 983 F. Supp. 1464, 1470 (N.D. Ga. 1996) (admonishing that a party advocating two sharply contradictory positions "will not be permitted to 'speak out of both sides of his mouth with equal vigor and credibility before this court'") (citation omitted).

In this case, Dr. Kutty has waived his right to challenge the validity of the LCAs and H-1B

-13-

petitions. When Dr. Kutty submitted the LCAs and H-1B petitions, and then subsequently hired the doctors for several years (and thus, benefitted from their employment), he "acquiesced" to the validity of the LCAs and H-1B petitions. Even though "estoppel is not favored" under Tennessee law, *see, e.g.*, <u>Faust v. Metro. Gov't of Nashville</u>, 206 S.W.3d 475, 497 (Tenn. Ct. App. 2006), the Court finds that estoppel is appropriate in this case.

First, Dr. Kutty was aware of the requirements in filing the LCAs–after all, he was the one who filed them. Dr. Kutty therefore was aware (or should have been aware) that he needed to provide proof of various documents with the LCAs. The fact that he did not provide these documents is his own fault. Notably, the INA does not allow the DOL to reject an LCA unless "the application is incomplete or obviously inaccurate." 8 U.S.C. § 1182(n)(1). Moreover, the "DOL is not the guarantor of the accuracy, truthfulness or adequacy of a certified labor condition application. The burden of proof is on the employer to establish the truthfulness of the information contained on the labor condition application." 20 C.F.R. § 655.740©. When Dr. Kutty filed the LCAs, he certified, under penalty of perjury, that he was providing accurate information:

> DECLARATION OF EMPLOYER. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the information provided on this form is true and correct. In addition, I declare that I will comply with the Department of Labor regulations governing this program.

[AR 01539].

Second, Dr. Kutty clearly obtained benefits from the H-1B program–he was able to hire the doctors to work in his clinics. It would be patently unfair for Dr. Kutty to submit these documents, obtain benefits under the program for years, and then later argue that the documents should not have been approved. Dr. Kutty accepted "the services of [the employees] for such a period of time as to impliedly consent to or acquiesce" to the validity of the LCAs and H-1B petitions. <u>Crye-Leike, Inc.</u>,

2011 WL 2112768, at *11.  Because Dr. Kutty has asserted two wildly inconsistent positions, he

should be equitably estopped from raising his new argument.  *See* Hinton v. Stephens, No. W2000-

02727-COA-R3-CV, 2001 WL 1176012, at *3 (Tenn. Ct. App. Oct. 4, 2001) ("Estoppel is an

equitable doctrine which prevents a party from raising a claim or taking a legal position when her

conduct with regard to that claim is contrary to her position.") (citation omitted).

 Moreover, to the extent that Dr. Kutty argues that the LCAs were inconsistent with his

employment agreements, [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 24-25,

33], that has no bearing on the Court's analysis.  Notably, Dr. Kutty was not required to submit

employment agreements with his LCAs or H-1B petitions.  It does not matter whether the private

contracts were inconsistent with the wages listed in the LCAs.  The H-1B doctors' wages were set

by statute, not by contract.  On the LCAs, Dr. Kutty promised that he would pay the higher of the

actual wage or the prevailing wage for the occupation in the area of employment, and listed an

appropriate prevailing wage.  Dr. Kutty signed the LCAs for all seventeen doctors, thereby agreeing

to the following:

> H-1B nonimmigrants will be paid at least the actual wage level paid
> by the employer to all other individuals with similar experience and
> qualifications for the specific employment in question or the
> prevailing wage level for the occupation in the area of employment,
> whichever is higher.

[AR 01539].  Regardless of the private contracts, Dr. Kutty had to pay the "required wage," as set

forth in the INA.

 Finally, Dr. Kutty argues that the INS[2] erred by approving the H-1B petitions before the

---

[2]  At the time the H-1B petitions were submitted, they were sent to the Immigration and
Naturalization Services ("INS").  This changed a few years later, when Congress passed the Homeland
Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2195-97.  As a result of the new legislation, the
adjudication of immigrant visas was transferred from the INS to the United States Citizenship and

-15-

doctors were licensed to practice medicine in Tennessee. That argument, however, is also rejected.

The INA explicitly recognizes that H-1B workers must be regarded as "employees" even before they

obtain licenses. 8 U.S.C. § 1182(N)(2)(C)(vii)(I). Notably, the "no benching" provision prohibits

an employer from placing a worker in nonproductive status based upon the worker's "**lack of a**

**permit or license**." Id. (emphasis added). Even though the doctors did not have Tennessee medical

licenses when the H-1B petitions were submitted, Dr. Kutty still had to follow the "no benching"

provision. Dr. Kutty cannot rely upon a private contract to defeat responsibilities imposed by

federal law.

2. **The ARB Was Not "Arbitrary and Capricious" in Finding that the Medical Clinics Violated the "No Benching" and Anti-Discrimination Provisions**

Having carefully reviewed the record, the Court agrees that Dr. Kutty's proffered reasons

for not paying the doctors was pretextual. Based upon the following facts, it is quite clear that Dr.

Kutty discriminated and retaliated against the doctors for filing complaints with the DOL, and that

he withheld the "required wages" in violation of the "no benching" provision. 8 U.S.C. §

1182(n)(2)(C)(iv).

First, Dr. Kutty discriminated against the doctors by cutting their salaries. The applicable

prevailing wage rates ranged from $52,291 to $115,357, but the doctors generally were paid far less.

[AR 07936]. Despite signing the LCAs and H-1B petitions attesting that he would pay the

prevailing wage rates, Dr. Kutty did not do so. [AR 07928]. When Dr. Kutty refused to pay the

"required wages," eight of the doctors submitted a letter to Dr. Kutty on February 14, 2001. [AR

09091-94]. In that letter, the doctors demanded that Dr. Kutty pay their salaries, or that they would

_____

Immigration Services ("USCIS").

notify the DOL.  [Id.].  The eight doctors hired Robert Divine ("Mr. Divine") as their attorney, who wrote the following letter on their behalf:

> [T]hey hereby demand immediate payment of all amounts due, being the difference between the amounts previously paid and the rate of $115,000 per year as set forth in . . . the labor condition application ('LCA'). . . . If you fail to tender payment of such amounts within one week . . . the Doctors will notif[y] . . . the U.S. Department of Labor.

[AR 03303-04] [footnote omitted].  Mr. Divine also cited the INA's "no benching" and anti-discrimination provisions.  [Id.].  After the letter was sent to Dr. Kutty, none of the eight doctors were paid again except for one partial payment.  [AR 09082, 07868, 07872].  In contrast, the doctors who did not join in the letter received paychecks.  [AR 06602-03].

On February 28, 2001, Mr. Divine filed a complaint with the DOL on behalf of the eight doctors.  [AR 09082, 07939].  On March 19, 2001, the DOL sent Dr. Kutty a letter stating that it would be conducting an investigation on March 21, 2001.  [AR 07939].  On that date, members of the DOL's Wage Hour Division conducted an on-site record inspection of the Sumeru Health Care Group.  [AR 09082, 06449, 06452].  Mr. Divine also faxed a letter to Dr. Kutty demanding that two additional doctors receive back wages.  [AR 07916].  Later that day, Dr. Kutty fired seven of the ten doctors represented by Mr. Divine.  [AR 09082, 07939, 09093 n.11].  Each doctor who did not join in the legal action remained employed.

The INA contains a "whistleblower" provision that protects employees who (1) disclose information that they reasonably believe shows a violation of the INA, or (2) cooperate in an investigation concerning the employer's compliance with the INA.  8 U.S.C. § 1182(n)(2)(c)(iv). In order to establish a prima facie case of retaliatory discrimination, the following elements must be met:

(1)     that the party charged with discrimination is an employer subject to the Act;

(2)     that the complaining employee was discharged or otherwise discriminated against with respect to his compensation, terms, conditions, or privileges of employment; and

(3)     that the alleged discrimination arose because the employee participated in an [investigation] under . . . the [DOL].

DeFord v. Sec'y of Labor, 700 F.2d 281, 286 (6th Cir. 1983).  In this case, the ARB had to determine whether, by a preponderance of the evidence, (1) the doctors engaged in a protected activity; (2) Dr. Kutty knew about the activity; and (3) Dr. Kutty took adverse action against the doctors because of the protected activity.  Each element has been met.

First, the doctors were engaged in a protected activity when they submitted letters to the DOL about possible INA violations.  The INA–through its "whistleblower" provision–protected that very activity.  Second, Dr. Kutty clearly knew about the protected activity, as the DOL notified him about the investigation.  Third, Dr. Kutty took adverse action against the doctors–cutting their salaries, and eventually firing them–based upon the letters sent to the DOL.  The timing of Dr. Kutty's adverse decisions is significant.  It was **only** after Dr. Kutty received the letter from Mr. Divine on February 14, 2001, that he sent the doctors written reprimands.  [AR 09093, 07803, 07927-28].  Again, the letter demanded back wages for seven doctors, and threatened to contact the DOL unless Dr. Kutty complied.  [AR 03303-04].  Equally telling, the reprimands were **only** sent to the doctors identified in Mr. Divine's letter.  [AR 07927].  In addition, many of the doctors testified that prior to Mr. Divine's letter, Dr. Kutty had never been critical of their work.  [AR 01590-07880-81, 07887, 07893-94, 07898].  Finally, seven of the doctors–all represented by Mr. Divine–were fired on the same day as the DOL investigation.  The timing of these adverse decisions

-18-

cannot be understated.

Moreover, the Court finds that Dr. Kutty's proffered reasons for taking adverse action was pretextual. *See* Bartlik v. U.S. Dep't of Labor, 73 F.3d 100, 103 n.7 (6th Cir. 1996) (recognizing that if an employer can offer a legitimate, nondiscriminatory reason for taking adverse action against an employee, that can serve as a defense to a prima facie case of retaliatory discharge, as long as it is not pretextual). Dr. Kutty claims that he did not pay the doctors because they failed to generate income, were not credentialed, and did not work 40 hours per week. [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 30-31]. While Dr. Kutty states that he fired the doctors because they failed to perform their duties (work enough hours, etc.), the ALJ and ARB found otherwise. The ALJ and ARB's credibility determinations are given substantial deference, and the Court will not disturb them. Litton Microwave Cooking Prods. Div., Litton Sys., 868 F.2d at 857 (stating that courts "will not normally disturb the credibility assessments of the [ARB] or an administrative law judge, 'who has observed the demeanor of the witnesses'") (citing Baja's Place, 733 F.2d at 421). In this case, the ALJ heard testimony regarding the hours worked by the doctors, the quality of their work, etc. Having listened to their testimony, the ALJ was in the best position to make a credibility determination:

> The weight of the evidence, including consistent testimony from the doctors and staff, who were separated during the hearing, supports the conclusion that the doctors were fulfilling their obligations and trying to build their practice despite difficult conditions, including insufficient planning, over-expansion, poor management of key functions such as billing, and under-funding of the clinics by Respondents.

[AR 07927]. The Court will not disturb the ALJ's finding..

Finally, to the extent that Dr. Kutty states that he fired the doctors because they were not

-19-

credentialed, that simply is not true. At the time Dr. Kutty fired the doctors, they were all certified

to practice medicine in Tennessee. Thus, Dr. Kutty's proffered reason for their firing is simply

pretextual. Accordingly, the Court finds that the ARB was not "arbitrary and capricious" in finding

that the medical clinics violated the INA's "no benching" and anti-discrimination provisions.

### C.     The ARB Was Not "Arbitrary and Capricious" in Deciding to Pierce the Corporate Veil of the Medical Clinics to Hold Dr. Kutty Personally Liable for the INA Violations

#### 1.     The Court May Pierce the Corporate Veil for INA Violations

In this case, it was the medical clinics–not Dr. Kutty–that submitted the LCAs and H-1B

petitions. Pursuant to the INA, the entity ("employer") which files the LCAs and the H-1B petitions

is generally the party liable for any violations. In its "Final Decision and Order," the ARB found

that some of the corporate entities owned by Dr. Kutty violated the "no benching" and anti-

discrimination provisions of the INA. The ARB also upheld the ALJ's decision to hold Dr. Kutty

personally liable for the violations–that is, the ARB pierced the corporate veil of the corporate

entities owned by Dr. Kutty. [AR 07952-54, 09095-97]. Dr. Kutty argues that this was improper

for two reasons. First, Dr. Kutty argues that personal liability is not authorized under the statute.

Second, he argues that even if the INA allowed personal liability, the facts of the case do not support

piercing the corporate veil.

First, Dr. Kutty claims that Tennessee corporate law principles are completely inapplicable,

as there is no section in the ACWIA that addresses personal, rather than corporate, liability.[3] [Dr.

---

[3] Here Dr. Kutty delves into a discussion of the Supreme Court's seminal decision in <u>Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984), arguing that <u>Chevron</u> stands for the proposition that the lack of ambiguity in the ACWIA does not permit the Court's deference to the agency's interpretation of the organic statute. [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 35-37]. <u>Chevron</u>, however, is inapposite, as that case pertains to the validity of an agency's promulgation of regulations with respect to an organic statute. <u>Chevron</u>, 467 U.S. at 843-844 (discussing agency's authority "to elucidate a

Kutty's Memorandum in Support of his Petition, Doc. 18, at 35-37]. The statute's silence, however, is the very reason why Tennessee corporate law principles are applicable. In <u>United States v. Bestfoods</u>, 524 U.S. 51 (1998), the Supreme Court held that a parent corporation could be held derivatively liable under a federal statute for the acts of its subsidiary when the corporate veil could be pierced under state law. <u>Id.</u> at 61-64 (piercing the corporate veil of a parent company in an action brought under the Comprehensive Environmental Response, Compensation and Liability Act, "CERCLA").[4] In particular, the Supreme Court stated,

> [The statute at issue] is thus like many another congressional enactment in giving no indication that 'the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute,' <u>Burks v. Lasker</u>, 441 U.S. 471, 479, 99 S. Ct. 1831, 1837, 60 L. Ed. 2d. 404 (1979), and the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that '[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law,' <u>United States v. Texas</u>, 507 U.S. 529, 534, 113 S. Ct. 1631, 1634, 123 L. Ed. 2d. 245 (1993) (internal quotation marks omitted).

<u>Id.</u> at 63. Accordingly, where the statue is silent, a court may, to the extent state law authorizes the corporate veil to be pierced, charge the typically insulated entity with derivative liability. <u>Id.</u> at 63-64.

Federal courts have repeatedly pierced the corporate veil to hold shareholders individually liable for violating federal statutes, even when those statutes do not expressly provide for such liability. *See* <u>Carter Jones Lumber Co. v. LTV Steel Co.</u>, 237 F.3d 745, 750 (6th Cir. 2001) (holding

---

specific provision of the statute by regulation" where that statute is silent). While the instant issue also deals with statutory silence, the nature of the issue at hand is judicial imposition of liability, **not agency rulemaking**.

[4] The Supreme Court likewise held that *direct*, as opposed to derivative, liability could issue under CERCLA from the parent corporation's active participation and direct control over the facility itself, not simply the subsidiary's general operations. <u>Bestfoods</u>, 524 U.S. at 67-73. No parallel application of direct liability is at issue in the present case.

a shareholder liable under CERCLA, even thought the statute does not mention personal liability, and applying state common law to pierce the corporate veil) ("The Supreme Court makes it clear [in Bestfoods] that courts should continue to look to the common law to determine whether to hold a corporate shareholder personally liable for the acts of the corporation in the CERCLA context."); United States v. WRW Corp., 986 F.2d 138, 143 (6th Cir. 1993) (in an action brought under the Federal Mine Safety and Health Act, the Sixth Circuit held that the corporate veil of a company could be pierced to hold officers and directors personally liable for violations of the federal statute); Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan v. Hroch, 757 F.2d 184, 190-91 (8th Cir. 1985) (in an action brought against a company under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), the court had to determine whether the company's president could be held personally liable for the company's wrongdoing); Bufco Corp. v. NLRB, 147 F.3d 964, 969 (D.C. Cir. 1998) (in an action brought against a company under the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (8)(a)(1), the court had to determine whether the company's sole shareholder could be held personally liable for the company's wrongdoing); NLRB v. Bolivar-Tees, Inc., 551 F.3d 722, 727-28 (8th Cir. 2008) ("Whether a shareholder can be personally liable for a corporation's financial obligations resulting from its unfair labor practice under the NLRA is a question of federal law because it arises in the context of a federal labor dispute. Although Congress did not provide specifically for shareholder liability for violations of the NLRA, federal courts have pierced the corporate veil to hold shareholders liable for violations of federal statutes, including the NLRA.") (citations and quotations omitted). In other words, piercing the corporate veil is a common-law principle that applies to the enforcement of federal statutes, unless the statute expressly says otherwise. Bestfoods, 524 U.S. at 62-63.

Because the ACWIA is silent on this issue, the ARB looked to Tennessee[5] common law

principles to determine whether it was proper to pierce the corporate veil. The Sixth Circuit has held

that federal courts should follow state common law–not federal common law–in determining

whether to pierce the corporate veil to attach shareholder liability for a corporation's violation of

federal law. Carter-Jones Lumbar Co., 237 F.3d at 746 n.1.[6]

## 2. Piercing the Corporate Veil is Appropriate in this Case

Under Tennessee law, a corporation "is presumptively treated as a distinct entity, separate

from its shareholders, officers, and directors." Nadler v. Mountain Valley Chapel Bus. Trust, No.

E2003-00848-COA-R3-CV, 2004 WL 1488544, at *4 (Tenn. Ct. App. Jun. 30, 2004) (citing

Schlater v. Haynie, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). However, a corporation's separate

identity may be disregarded or "pierced" upon showing "that it is a sham or a dummy or where

necessary to accomplish justice." Schlater, 833 S.W.2d at 925. The determination of whether to

pierce the corporate veil is "largely a factual one," and "particularly within the province of the trial

court." Boles v. Nat'l Dev. Co., 175 S.W.3d 226, 244 (Tenn. Ct. App. 2005). The burden "is on

the party seeking to pierce the corporate veil to prove facts sufficient to warrant such an action."

Nadler, 2004 WL 1488544, at *4 (citing Schlater, 833 S.W.2d at 925).

When a corporation's veil is pierced, it is done "for the benefit of creditors of the

---

[5] Only the Tennessee corporations are at issue in this case. Because they were incorporated under Tennessee law, and because the doctors worked in these clinics, Tennessee law shall determine whether the corporate veil should be pierced.

[6] While the Sixth Circuit applies state common law, other federal courts apply federal common law to determine whether the corporate veil should be pierced. See, e.g., Bestfoods, 524 U.S. at 63 n.9 (recognizing that there is "significant disagreement among courts and commentators" regarding whether federal courts should "apply a federal common law" or "borrow state law" when piercing the corporate veil to attach shareholder liability for a corporation's violation of federal law.

corporation, allowing them to proceed against the individuals who are the 'trust owners of the entity.'" Reagan v. Connelly, No. E2000-00451-COA-R3-CV, 2000 WL 1661524, at *6 (Tenn. Ct. App. Nov. 6, 2000) (quoting Muroll Gessellschaft M.B.H. v. Tenn. Tape, Inc., 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995)).  To determine whether a shareholder should be held liable for the wrongdoing of a corporate entity, Tennessee courts apply the following factors:

(1)     whether there was a failure to collect paid in capital;

(2)     whether the corporation was grossly undercapitalized;

(3)     the nonissuance of stock certificates;

(4)     the sole ownership of stock by one individual;

(5)     the use of the same office or business location;

(6)     the employment of the same employees or attorneys;

(7)     the use of the corporation as an instrumentality or business conduit for an individual or another corporation;

(8)     the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another;

(9)     the use of the corporation as a subterfuge in illegal transactions;

(10)    the formation and use of the corporation to transfer to it the existing liability of another person or entity; and

(11)    the failure to maintain arms length relationships among related entities.

Boles, 175 S.W.3d at 245-46 (quoting Fed. Deposit Ins. Corp. v. Allen, 584 F. Supp. 386, 397 (E.D. Tenn. 1984) (citations omitted)).  As the Tennessee Court of Appeals has stated, "[e]ach case involving disregard of the corporate entity must rest upon its special facts.  Generally, **no one factor**

-24-

**is conclusive** in determining whether or not to disregard a corporate entity; usually a combination of factors is present in a particular case and is relied upon to resolve the issue." Schlater, 833 S.W.2d at 925 (emphasis added) (citations omitted). *See also* Boles, 175 S.W.3d at 246 ("It is most important to note that it is not necessary that all of the Allen factors weigh in plaintiff's favor in order to justify the piercing of the corporate veil."). Accordingly, Dr. Kutty is incorrect when he states that **all** of the factors must be established in order to impose personal liability. [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 38].

Although a corporation's identity should be disregarded "with great caution and not precipitately," Schlater, 833 S.W.2d at 925, the Court finds that piercing the corporate veil is appropriate in this case. In particular, the Court finds that: (1) the medical clinics did not have an existence separate from Dr. Kutty; and (2) the interests of justice are served by piercing the corporate veil.

First, the ALJ concluded that "Dr. Kutty had sole control over the corporate entities who submitted the LCA's and nominally employed the doctors, as well as some or all of the Florida companies in which he was involved." [AR 07953]. Notably, Dr. Kutty testified to the following:

> Sumeru Healthcare Group, LLC is just me. Maya Healthcare is just me. Sumeru, Inc. is just me. And Center for Internal Medicine and Pediatrics in Maynardsville is just me.

[AR 01426, 07236-37]. In fact, Dr. Kutty admitted that "he was the president of the Tennessee companies, that the Tennessee clinics are owned by entities that are ultimately owned completely by him, that he is the only 'member' of these entities, and that he doesn't have to report to anyone else in relation to these entities." [DOL's Response in Opposition to Dr. Kutty's Petition, Doc. 30, at 42] [citing AR 01427, 01464-65, 07148, 07954]. All major decisions about staffing, salaries,

-25-

billing disputes, and miscellaneous employee questions were decided by Dr. Kutty. [AR 07864, AR 06725-26].

Second, the corporate form was largely ignored. While Dr. Kutty was the sole owner of the corporate entities, he denied specific knowledge of how the businesses were organized, or the formalities of corporate governance. [AR 07947]. Dr. Kutty does not know whether the corporate entities had a board of directors, or whether financial statements were ever issued. [AR 07950]. During the entire proceedings, Dr. Kutty did not provide any corporate records, such as minutes or financial records. [AR 07869, 07950]. In addition, there is no evidence that stock certificates were issued for the corporate entities. [AR 07869]. This lack of evidence about financial affairs is significant. *See* VP Bldgs. v. Polygon Group, Inc., No. M2001-00613-COA-R3-CV, 2002 WL 15634, at *7 (Tenn. Ct. App. Jan. 8, 2002) ("[W]e, like the trial court, are impressed by the lack of evidence regarding the corporation's financial activities."). In addition, Dr. Kutty used the corporate entities interchangeably, failing to properly recognize their corporate forms. For example, while the Florida corporation handled the administration of all of Dr. Kutty's operations [AR 07864], there were thirteen other corpriate entities named on the LCAs and H-1B petitions. As the DOL recounts, "[t]hese names were often used interchangeably with respect to employment of the same doctor." [DOL's Response in Opposition to Dr. Kutty's Petition, Doc. 30, at 10] [citing AR 07864, 01441, 05757-58, 05809]. In fact, one of the LCAs for the doctors listed

> 'Sumeru Health Care Group' as the employer, his paychecks were issued by 'Sumeru Health Care Group, Inc.' and by 'Center for Internal Medicine and Pediatrics, Inc.,' and his W-2 was issued by 'Center for Internal Medicine and Pediatrics, P.C.' [The H-1B doctor] was terminated by 'Maya Health Care.'

[DOL's Response in Opposition to Dr. Kutty's Petition, Doc. 30, at 11] [citing AR 01796, 01818,

01818, 01829, 01836]. The interchangeability between the corporate entities, and Dr. Kutty's lack of knowledge about his business and financial affairs, shows that Dr. Kutty largely ignored the corporate form.

Third, the ALJ found that Dr. Kutty "freely treated and shared personal and corporate assets as his own." [AR 07954]. While Dr. Kutty argues that "the record is completely devoid of any allegation of diversion of corporate funds for personal use," [Dr. Kutty's Supplemental Brief, Doc. 32, at 9], that is not true. Notably, Dr. Kutty stated that he was unaware of his annual income for the past few years [AR 07954], and that he did not have a savings account, checking account, credit card, stock portfolio, or foreign assets, [AR 01506-10]. In addition, one of the corporate entities owns his Lexus automobile and cellular phone. [AR 01506-07, 01509].

Fourth, the corporations were undercapitalized and operated at a loss. Notably, Dr. Kutty does not know much money was used to start the clinics. [AR 07954]. The Tennessee corporation, Sumeru Health Care Group, Inc., was dissolved in September 2000, and by the time of the hearing in June 2001, none of the Tennessee corporations were still operating. [AR 07152]. In her "Decision and Order," the ALJ concluded:

> Dr. Kutty never intended to pay the H-1B doctors the required wages, and willfully violated that and other requirements of the INA. The companies which submitted the LCAs in this case have gone out of business in Tennessee and, it appears, may have no assets to pay either the back wages or the civil money penalties. To the extent that the Tennessee clinics could have continued to operate and generate income and salaries based on the doctors' work, that possibility was foreclosed by Dr. Kutty's illegal action of terminating the doctors in retaliation for engaging in protected activity. The corporate entities were a sham, and piercing the veil is necessary to do justice for the H-1B employees. Like the corporations in the Federal Deposit Ins. Corp. case above, Dr. Kutty's corporations had no mind, will, or existence of their own, and his domination was used to perpetuate violations of statutory duties. Like the corporate officers held

-27-

> personally liable for a three-year course of fraudulent conduct under federal banking laws, Dr. Kutty should be personally liable to pay the back wages and civil money penalties due for his three-year course of fraudulent activity under the INA.

[AR 07954]. The ALJ also found that Dr. Kutty formed the undercapitalized corporations contemporaneously with hiring the doctors under the H-1B program, while intending to underpay them. [AR 07863].

Finally, the Court finds that Dr. Kutty and the medical clinics engaged in fraud. In <u>Southeast Texas Inns, Inc. v. Prime Hospitality Corporation</u>, the Sixth Circuit held that "fraud" or "injustice" is a necessary element to pierce the corporate veil under Tennessee law. 462 F.3d 666, 679 (6th Cir. 2006). In <u>Southeast Texas Inns</u>, the Sixth Circuit held that a parent company was not liable for its subsidiary's breach of a long-term tenancy agreement when the complaint failed to specifically allege an injustice or fraud. <u>Id.</u>. The court explained that the "conclusory allegations [in the complaint], couched in terms of a contractual breach, are not tantamount to the fraud or injustice required to pierce the corporate veil." <u>Id.</u> The court relied upon a previous decision by the Tennessee Supreme Court in concluding that fraud or injustice is a necessary element to pierce the corporate veil. <u>Id.</u> at 673 n. 12 (citing <u>Cont'l Bankers Life Ins. Co. v. Bank of Alamo</u>, 578 S.W.2d 625, 632 (Tenn. 1979)). In <u>Continental Bankers Life Insurance</u>, the Tennessee Supreme Court developed the following three-prong test for piercing the corporate veil of parent companies:

(1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.

(2) **Such control must have been used to commit fraud or wrong**, to perpetuate the violation of a statutory or other

-28-

positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

(3)    The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Se.Tex. Inns, 462 F.3d at 673 n.12 (emphasis added) (citing Cont'l Bankers Life Ins., 578 S.W.2d at 632). Thus, the Sixth Circuit has held that "fraud" or "injustice" is a necessary element under Tennessee law to pierce the corporate veil.

Dr. Kutty argues that the corporate veil should not be pierced in this case because the DOL failed to show that the medical clinics engaged in fraud. [Dr. Kutty's Supplemental Brief, Doc. 32, at 7-10]. As Dr. Kutty alleges:

> Moreover, the record is completely devoid of any facts to support that the formation of the Medical Clinics and the entering in the Employment Agreements with the H1-B [sic] Physicians was a fraudulent action. The record is devoid of any facts to even suggest that Dr. Kutty desired to engage in any fraudulent activity or defraud the H1-B [sic] Physicians.

[Id., at 9]. In sum, Dr. Kutty claims that the "business ventures failed despite good faith attempts by the corporate entities to have the H1-B [sic] Physicians and medical Clinics succeed, and as such, there is no basis to pierce the corporate veil to impose personal liability . . ." [Id., at 10].

Under Tennessee law, "[t]he burden is on the party seeking to pierce the corporate veil to prove facts sufficient to warrant such an action." Nadler, 2004 WL 1488544, at *4 (citing Schlater, 833 S.W.2d at 925). In this case, the DOL has clearly met its burden. During the administrative proceedings, the ALJ found that Dr. Kutty misrepresented his intentions to both the government and the doctors. [AR 07928, 07943-44]. First, Dr. Kutty misrepresented to the government (in the LCAs and the H-1B petitions) that he would pay the required wages to the doctors, when in fact he did not. Second, Dr. Kutty misrepresented his intentions to the doctors when he promised to pay

-29-

them the required wages, but he did not. The ALJ also found that the failure to pay was "willful," and that Dr. Kutty formed the undercapitalized corporations to employ the doctors in violation of the INA. Notably, Dr. Kutty testified that he planned to underpay the doctors because he expected the clinics to lose money for three to five years. [*See, e.g.*, AR 07863]. In addition, once the doctors gained their Tennessee medical licenses, there was often no jobs available. [*See, eg.*, 07873].

Moreover, Dr. Kutty only reprimanded employees who complained about the DOL violations. He withheld the salaries of the doctors who complained (thereby violating the "no benching" provision), and eventually fired seven of them. The firing occurred on the same day as the Wage and Hour investigation into Dr. Kutty's practice. Considering these facts as a whole, it is clear that the medical clinics and Dr. Kutty committed fraud. Accordingly, the Court finds that the ARB was not "arbitrary and capricious" in deciding to pierce the corporate veil, and impose individual liability on Dr. Kutty.

### D. The ARB Was Reasonable in Ordering Dr. Kutty to Pay the Expenses Incurred in Obtaining the H-1B Visas and J-1 Waivers

In the "Final Order and Decision," the ARB concluded that Dir. Kutty should pay the expenses for obtaining the H-1B visas and J-1 waivers. In reaching this conclusion, the ARB held that the fees qualified as "business expenses." Dr. Kutty objects to this determination, arguing that the expenses to obtain the H-1B visas are personal to the employee. [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 28].

Notably, the INA regulations state that in order to satisfy the required wage obligation:

> [t]he required wage rate must be paid to the employee, cash in hand, free and clear, when due, except that, deductions made in accordance with paragraph (c)(7) of this section may reduce cash wage below the level of the required wage.

20 C.F.R. § 655.731(c)(1) (1995). In turn, paragraph (c)(7) of 20 C.F.R. § 655.731 allows the employer to take deductions that meet certain criteria. However, deductions that are "a recoupment of the employer's business expense" are not permitted, if the deductions depress the employee's wages below the required wage. 20 C.F.R. § 655.731(c)(7)(ii), (iii)©, (9) (1995).

Having reviewed the statute, the Court finds that the ARB has offered a "permissible construction of the statute." Am. Nuclear Res. Inc. v. U.S. Dep't of Labor, 134 F.3d 1292, 1294 (6th Cir. 1998) (internal quotation marks and citation omitted). As an initial matter, the Court notes that obtaining the J-1 waiver is necessary to secure approval of the H-1B petitions. In addition, it is the employer-not the nonimmigrant alien-who files for the H-1B petitions. It is also the employer who attests that he will comply with the responsibilities under the INA, not the employee. It is a reasonable interpretation of the statute to impose costs on the employer, not the employee. Additionally, no fees were assessed against Dr. Kutty that were the result of work performed by the attorneys that were personal to the doctors. [AR 09089-90]. Accordingly, the ARB's decision is affirmed.

### E.   The ALJ's Conduct During the Administrative Hearings Was Not Procedurally "Arbitrary and Capricious"

Finally, Dr. Kutty argues that his rights to due process were violated by the manner in which the ALJ conducted the hearings in June and December of 2001. Specifically, Dr. Kutty asserts that his rights to due process were violated because: (1) the ALJ failed to postpone the hearings once Dr. Kutty fell ill in June 2001; (2) the ALJ admitted Dr. Kutty's prior deposition testimony, and the testimony of Mr. Basavaraj Hooli ("Mr. Hooli"); and (3) the ALJ imposed personal liability, even though Dr. Kutty was absent from some of the hearings. In response, the DOL argues that (1) Dr. Kutty waived these arguments by not raising them in the agency proceedings; and (2) in any event,

-31-

Dr. Kutty received due process.  [DOL's Response in Opposition to Dr. Kutty's Petition, Doc. 30, at 59-62].

### 1.      Dr. Kutty Waived His Argument

The issue presently raised by the DOL is the applicability of the doctrine of "issue exhaustion," which "provides that it is inappropriate for courts reviewing agency decisions to consider arguments not raised before the administrative agency involved."  Coal. for Gov't Procurement, 365 F.3d at 461-62.  The Supreme Court articulated this doctrine in Sims v. Apfel, 530 U.S. 103 (2000) (plurality opinion).  Typically a statute or regulation requires issue exhaustion, id. at 107-08; however, in situations where the organic statute is silent and no regulations exist on point, a judicially imposed doctrine of issue exhaustion may, in certain circumstances, be appropriate, id. at 108; Coal. for Gov't Procurement, 365 F.3d at 463.  Specifically, "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding."  Sims, 530 U.S. at 109.  By contrast, if an agency proceeding is more inquisitorial in nature, a judicially imposed requirement of issue exhaustion is inappropriate.  Id. at 110.

In Sims, the Supreme Court articulated several factors which led the plurality to conclude that the Social Security disability proceeding was inquisitorial in nature, namely "the broad investigatory authority vested to the decision-maker, the unilateral nature of the proceedings, and the express informality of the administrative process."  Coal. for Gov't Procurement, 365 F.3d at 464 (discussing Sims, 530 U.S. at 110-12).  "In contrast, [the Sixth Circuit] has identified ... the relevant factors when considering whether a proceeding is sufficiently adversarial."  Id.  Specifically, the Sixth Circuit has found that where administrative proceedings (1) "commence[] with a 'Notice to

Appear,' a charging document, or complaint-like pleading which vests jurisdiction with the [ALJ]"; (2) is governed by an evidentiary standard; (3) affords all interested parties the right to appear and be heard; and (4) are presided over by an impartial administrative judge, the proceeding is sufficiently adversarial in nature for the imposition of an issue exhaustion requirement. Id. (quoting Detroit Free Press v. Ashcroft, 303 F.3d 681, 698 (6th Cir. 2002)).

The Court finds that the instant proceedings bears the hallmarks of an adversarial proceeding. First, the hearing was governed by evidentiary standards, both by rules of evidence closely tracking the Federal Rules of Evidence, 29 C.F.R. §§ 18.101–18.1104, and by a requisite standard with which the ALJ's findings and the ARB's decision had to conform, 8 U.S.C. § 1182(n)(2)(G)(viii) (2006) (hearings to be conducted in accordance with 5 U.S.C. § 556)); 5 U.S.C. §556(d) (2006) (requiring decisions to be supported by "reliable, probative, and substantial evidence"). Second, each party had the right to appear and be heard. *See* 8 U.S.C. § 1182 (affording all interested parties notice and an opportunity for hearing). Third, the hearing was presided over by an impartial ALJ in accordance with 5 U.S.C § 556(b)(3).

Based upon the adversarial nature of the hearing, the doctrine of issue exhaustion applies to the instant case. Accordingly, Dr. Kutty has waived his right to this Court's review of his due process claims by failing to raise them before the ARB. *See* Cellnet Commc'ns, Inc. v. FCC, 149 F.3d 429, 442 (6th Cir. 1998) ("Procedural objections under the APA are precisely the sort of issues appropriately raised before the [agency] in the first instance.") (internal quotation marks and citations omitted).

## 2.    In Any Event, Dr. Kutty Received Due Process

The Due Process Clause of the Fifth and Fourteenth Amendments require that notice and

opportunity for a hearing must precede a deprivation of life, liberty, or property by adjudication. Mullhane v. Cent. Bank & Trust Co., 339 U.S. 306, 313 (1950). This requirement applies equally to courts and to administrative agencies that adjudicate. Gibson v. Berryhill, 411 U.S. 564, 579 (1973). In this case, the record is clear that Dr. Kutty received due process.

First, in proceedings before an ALJ, "[a]ny party shall have the right to appear . . . in person, by counsel, or by other representative." 29 C.F.R. § 18.34(a). As Dr. Kutty availed himself of counsel at the June 2001 hearing, it was not inappropriate for the ALJ to proceed in Dr. Kutty's absence. In fact, during the hearing following Dr. Kutty's admission to the hospital on June 7, 2001, his counsel expressly stated that Dr. Kutty wished for the hearing to proceed in his absence. [AR 05196]. In addition, once the hearings resumed in December 2001, Dr. Kutty decided to represent himself (even delivering the closing statement). Over the course of the administrative proceedings, Dr. Kutty and his counsel had more than enough opportunities to present evidence and argument.

Second, it was permissible for the ALJ to admit Dr. Kutty's deposition testimony. As the Code of Federal Regulations provides:

> At the hearing, any part of or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition . . . in accordance with any one of the following provisions . . . (3) **The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or duly authorized agent of a public or private corporation**, partnership, or association which is a party, may be used by any other party for any purpose. (4) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the presiding officer finds . . . (ii) That the witness is out of the United States. . . . or (iii) **That the witness is unable to attend to testify because of . . . sickness . . .**

29 C.F.R. § 18 (a)(3)-(4)(ii-iii) (emphasis added). Dr. Kutty's deposition testimony was admissible for two reasons. First, Dr. Kutty–a party in the administrative proceeding–was an officer and

director of the medical clinics, which were organized as private corporations. 29 C.F.R. § 18 (a)(3). Second, Dr. Kutty was unable to attend some of the hearings in June 2001–and later that summer he claims–because of a sickness or infirmity, or because he was in India. 29 C.F.R. § 18 (a)(4)(iii). Regardless of whether he was absent as a result of illness or travel, the deposition testimony was admissible. Moreover, the deposition testimony was sufficiently related to the administrative hearing. The deposition testimony involved a related proceeding filed in state court by ten of the doctors against Dr. Kutty and six of the corporations. [AR 07864]. In that case, the doctors obtained an injunction restraining Dr. Kutty and the corporations from enforcing the $250,000 employment contract penalty clauses. In addition, Dr. Kutty provided sworn testimony at the deposition, and was represented by the same attorney in the present case. Accordingly, Dr. Kutty's objections regarding the admissibility of his deposition testimony are without merit.

Third, Mr. Hooli was qualified as a witness, given his personal knowledge of the matter. 29 C.F.R. § 18.602 (stating that the determination of the qualifications of a person to be a witness is solely within the judge's discretion). While Dr. Kutty states that Mr. Hooli was a "subordinate employee who lacked relevant knowledge of the matter," [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 42], the facts show otherwise. Mr. Hooli worked with Dr. Kutty, and was the "Administrator" of the corporate entities. Moreover, it was Dr. Kutty who designated Mr. Hooli as the "corporate representative" for the administrative hearings. If Dr. Kutty did not believe that Mr. Hooli had personal, relevant knowledge, then he should not have appointed him. As the corporate representative, Mr. Hooli was allowed to question witnesses on behalf of the corporations, as well as testify on their behalf. [AR 06921, 06925-26, 07063, 07105, 07107-46]. It would be patently unfair if Dr. Kutty could appoint Mr. Hooli as the corporate representative, but then allow

him to argue that his due process rights were violated based upon that appointment.

Finally, the Court finds that Dr. Kutty's remaining arguments are also without merit. Dr. Kutty argues that the ALJ erred by "imposing personal liability in Dr. Kutty's absence at the hearing for perceived corporate violations which only he could fully explain and defend." [Dr. Kutty's Memorandum in Support of his Petition, Doc. 18, at 42]. This is far from the truth. In fact, Dr. Kutty (1) requested that the June 2001 hearings continue in his absence [AR 05196]; (2) was represented by counsel in his absence; and (3) when he was no longer represented by counsel in December 2001, he represented himself. At the beginning of the December 4th hearing, the ALJ asked Dr. Kutty whether he wished to proceed without counsel:

> ALJ: Dr. Kutty, what is your position with respect to whether you want to seek legal representation to continue the case?
>
> Dr. Kutty: Well, I will represent myself on this one.
>
> ALJ: All right. So, you wish to then proceed without legal counsel?
>
> Dr. Kutty: Yes, I do.

[AR 06928-29]. Dr. Kutty's decision to proceed without counsel was just that: **his decision**. He cannot argue–years after the fact–that he was denied due process when he was given every opportunity to make his case. Dr. Kutty's own testimony during the ALJ proceeding shows that he received a fair trial. During his closing argument to the ALJ, Dr. Kutty stated the following:

> I have been allowed, through counsel to cross-examine witnesses, present evidence and today make a closing argument. Before I comment on the evidence, I must thank American [sic], not only for the material things that I have enjoyed in this country, but more importantly, for due process that is an open trial, where I could freely and an impartial judge. And I would like to really like to thank you at this moment.

-36-

[AR 07225].  The evidence overwhelmingly shows that Dr. Kutty received a fair trial.  His own testimony shows as much.

## IV.    CONCLUSION

Based upon the foregoing, Dr. Kutty's Petition for Review [Doc. 18] is **DISMISSED,** and the ARB's ruling is **AFFIRMED**.


**IT IS SO ORDERED**.


**ENTER:**


_____s/ Thomas W. Phillips_____
United States District Judge